R. GSELL & CO., Inc., Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 285, Docket 26674.

United States Court of Appeals
Second Circuit.

Argued March 24, 1961.

Decided Sept. 22, 1961.

Francis J. Rogers, New York City, for petitioner-appellant.

Michael I. Smith, Attorney, Department of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent-appellee.

Before MOORE, FRIENDLY and SMITH, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

The taxpayer, R. Gsell & Co. Inc., petitions to review an order of the Tax Court of the United States, assessing a penalty under Section 102(a) (failure to declare dividends)[1] of the Internal Reve-

---

1. "§ 102. Surtax on corporations improperly accumulating surplus.

"(a) [As amended by Sec. 103(d), Revenue Act of 1941, c. 412, 55 Stat. 687] *Imposition of tax.* There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, *however created or organized,* is formed or availed of for the purpose

nue Code of 1939, as amended, 26 U.S. C.A. § 102(a) against the taxpayer for its fiscal years 1947 through 1950 and 1952. The findings and opinion below are reported in 34 T.C. 41. The returns for the tax years involved having been filed for all years except 1952 at the office of the Collector of Internal Revenue for the Third District, New York, and the 1952 return having been filed at the Upper Manhattan District, New York, the petition for review is properly before this court. (26 U.S.C.A. § 7482.)

Taxpayer is a New York corporation, organized in 1922, and is engaged in the business of purchasing, assembling and selling Swiss watches and movements. During the tax years in question, Roland Gsell, President of taxpayer, together with his wife, owned substantially all of the stock of the corporation.

Taxpayer's business during the relevant years was divided into two departments—a merchandising department and a commission department with an interrelationship between the two. The merchandising inventory enabled taxpayer to supply commission customers with watches in the event they underestimated their needs; the experience gained in merchandising watches made it possible for taxpayer to keep abreast of the market trends and to give commission customers style advice. Furthermore, the merchandising business if on a profitable basis would enable the taxpayer to survive if any or all of its commission customers decided to use another broker or to import directly from the Swiss watch manufacturers.[2] At one time, taxpayer's chief business was the merchandising of watches. However, during the years in issue the merchandising of expensive watches had become unprofitable whereas taxpayer flourished as a broker for commission customers.

In the merchandising department, orders for watch movements were placed with Swiss factories. These factories would not contract for a fixed delivery date. In accordance with practices of the Swiss watch cartel, the Swiss factories would cable a buyer such as taxpayer that its watch movements were being shipped. Taxpayer then had to pay for the watches within 8 days of the day of shipment in order to gain the 5 per cent discount necessary to the successful operation of taxpayer's competitive business. Under the practices of the cartel, once a buyer had placed an order with a factory it was not cancelable; indeed, early in the manufacturing process the watch plates were stamped with taxpayer's United States Customs and brand marks.

During the years 1947 and 1948, deliveries from the Swiss factories took from 11 to 24 months after an order was placed. During later years, as a depression adversely affected the watch business, the time span decreased to as low as 8 months, but exact prediction of the delivery period was impossible and the factories might at their discretion have filled all of taxpayer's pending orders and then demanded immediate payment.

Because of the time gap in waiting for orders to be filled, commitments for movements were always high in relation to present sales. Taxpayer's open commitments for watch movements, duties, cases, boxes and attachments amounted to $397,643 as of June 30, 1947, and as of December 31st of the following years they amounted to: 1948, $457,537; 1949,

---

of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

"27½ per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus

"38½ per centum of the undistributed section 102 net income in excess of $100,-000."

2. Taxpayer's important commission customers during the tax years in issue included four major mail order firms in the country—Montgomery Ward, Alden, Sears Roebuck and Spiegel. If these customers had left taxpayer, it would have had to depend upon its merchandising business for survival.

$239,085; 1950, $148,548; 1951, $115,-815; 1952, $244,717. Although outstanding orders were never shipped all at one time, they might have been at the discretion of the Swiss factories.

When the movements arrived in this country, taxpayer was required to pay the United States Customs duty thereon in cash. The amount of the duty during the tax years at issue varied from 60 to 80 per cent of the value of the movements.

Petitioner's business had experienced its ups and downs. It was moderately successful from 1922 to 1929, but it lost money during eight of the ten years from 1930 through 1939, and it did not erase its capital deficit incurred during the depression years until World War II created a seller's market. As a result of more than twenty years of operation, the taxpayer closed its 1944 fiscal year with a capital surplus of only $7,676.

The first tax year at issue (1947) was taxpayer's most successful year in its history; both the commission and the merchandising departments were profitable. However, during all other years in issue, the commission department "carried" the merchandising department which lost money. Nevertheless, taxpayer had achieved a capital surplus of slightly more than $116,000 by the end of 1947 and this amount increased to $168,157 by the end of 1952.

During the depression years, taxpayer had made repeated efforts to finance its buying through bank loans. However, it experienced little success in obtaining loans. When successful, the loan was for a very limited time and was often called upon short notice. Because of these difficulties, taxpayer decided to forego the use of bank credit in its business and determined to use its own resources to finance operations. However, it did borrow some funds from the Mt. Vernon Watch Company, a company controlled by Roland Gsell, during 1945, 1946 and 1947.

During the late 1940's and the early 1950's, the watch business experienced a sharp recession. Sales dropped and were made on credit. During this recession, taxpayer's merchandising business lost money. Because taxpayer reduced its inventory, its cash position accordingly increased as it weathered the recession. During this period, taxpayer also looked for a new line of watches to strengthen its merchandising business. In 1952 taxpayer arranged to sell pin-lever watches, which were less expensive than the jewel-lever watches which it had previously sold. The first sales of the pin-lever type watch took place in 1953 and sales thereof increased steadily through 1956; correspondingly, taxpayer's cash on hand and outside investments decreased as it increased its inventory. Taxpayer paid a dividend of $5,000 in 1951 and one of $7,000 in 1952.

Taxpayer has made only one loan to a stockholder since its incorporation. In 1945 taxpayer loaned Mr. Gsell $9,000. The money was repaid a few months after the loan was made.

During some years, taxpayer made substantial investments in the securities of unrelated publicly traded corporations and in negotiable Government securities.

On November 19, 1956, the Commissioner notified taxpayer that he proposed to issue a notice of deficiency, relating to a surtax based on taxpayer's undistributed earnings and profits for the years 1947 through 1950 and the year 1952. Taxpayer responded by submitting a lengthy statement of the grounds on which it relied to show that the earnings and profits had not been permitted to accumulate beyond the reasonable needs of the business. Nevertheless, the Commissioner issued his notice of deficiency on May 15, 1957, and there followed the determination of the Tax Court from which petitioner seeks review.

The basic issue which arises in any proceeding under Section 102 of the Internal Revenue Code of 1939 is whether the "corporation [was] formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumu-

late instead of being divided or distributed." As an evidentiary corollary, Section 102(c) provides that:

"The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary."

Thus, where in a Section 102 case the Commissioner alleges that a taxpayer has accumulated earnings and profits beyond the reasonable needs of the business, the taxpayer must prove otherwise or be faced with a particularly heavy burden of proving that the accumulations were not motivated by a purpose to avoid a surtax on the shareholders.

The 1954 amendment of the Internal Revenue Code ended the taxpayer's burden of proving that its accumulations were not beyond the reasonable needs of the business by providing a method through which the taxpayer could switch to the Commissioner the burden of proving that the accumulations were unreasonable. (26 U.S.C.A. § 534.) Thus, where the taxpayer has been sent a notification informing it that a proposed notice of deficiency includes an amount with respect to the accumulated earnings tax, the taxpayer may shift the burden of proof on the issue of whether the accumulation was beyond the reasonable needs of the business by submitting a statement of the grounds (together with facts sufficient to show the basis thereof) on which it relies to establish that the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. (26 U.S.C.A. § 534(c).) Although Section 534 was not added to the Code until after the years here in issue, Section 534(e) (2) specifically provides that the Section shall apply "in the case of proceedings tried on the merits after the date of the enactment of this paragraph." This case is such a proceeding and the provisions of Section 534 apply.

However, the Commissioner contends that taxpayer's statement was inadequate in that it did not state legally sufficient grounds to show that taxpayer did not permit earnings and profits to accumulate beyond the needs of the business. The Commissioner seemingly has placed the proverbial cart before the horse. In order to switch the burden of proof on this issue to the Commissioner, Section 534 demands only that a taxpayer submit a statement of the grounds, and facts sufficient to show the basis thereof, on which it relies to prove that there was no unreasonable accumulation. (S.Rep. 1622, 83rd Cong.2d Sess. 71.)

This is not a case where the statement amounted to no more than notification that the taxpayer intended to attempt to prove that the accumulations were reasonable in light of the needs of the business. See I. A. Dress Co. v. Commissioner, 2 Cir., 1959, 273 F.2d 543, certiorari denied 1959, 362 U.S. 976, 80 S. Ct. 1060, 4 L.Ed.2d 1011. Taxpayer paid the full price of switching the burden of proof on the unreasonable accumulations issue to the Commissioner. In a twenty-four page statement, taxpayer showed its hand by stating substantially all the grounds on which it would rely to prove that the accumulations were not unreasonable in relation to its need for ready cash in its business. The statement was more than adequate to invoke the operation of Section 534 and to switch the burden of proof to the Commissioner on the issue of the reasonableness of the challenged accumulations in the light of taxpayer's business needs.

The Tax Court refused to determine whether the statement was adequate to shift the burden to the Commission; rather, it found on the whole record that the accumulation was unreasonable in light of the needs of the business. Although in some cases where the proof is convincing that there is no justification in a taxpayer's business for the alleged accumulations it may be unnecessary to determine whether the Commissioner or the taxpayer has the burden of proof on the question, see Dixie, Inc. v. Commis-

sioner, 2 Cir., 1959, 277 F.2d 526, 527, certiorari denied 1950, 364 U.S. 827, 81 S.Ct. 62, 5 L.Ed.2d 54; I. A. Dress Co. v. Commissioner, supra, 273 F.2d at page 544, in close cases the determination of who has the burden of proof on the unreasonable accumulations issue must be resolved. The party having the burden of proof does not merely have the burden of coming forward with evidence; it has the burden of persuasion and once fixed that burden does not shift. Commissioner of Internal Revenue v. Bain Peanut Co., 5 Cir., 1943, 134 F.2d 853, 857. In the close case, it is crucial to determine whether the Commissioner has the burden of persuading that the accumulation was unreasonable or whether the taxpayer has the burden of persuading that the accumulation was reasonable. Congress purposefully inserted Section 534 into the Internal Revenue Code of 1954 and the Courts have a duty to give the Section its intended effect. Taxpayer having here submitted a statement sufficient to shift the burden of proof on the issue of whether the accumulations were beyond the reasonable needs of the business to the Commissioner, the Government must assume the burden of persuasion that the accumulation was unreasonable.

Taxpayer submitted evidence through the testimony of its president Roland Gsell, and through the stipulation of facts that the accumulations in the years in issue were reasonable in light of the constant threat that ready cash would be needed to meet the obligations which might arise if large shipments from its Swiss watch sources were to arrive and evidence of taxpayer's difficulties in arranging satisfactory financing through banks.

The Commissioner, in turn, points to taxpayer's admittedly large investments during the years in issue in stocks and bonds of The American Telephone and Telegraph Company and in Government securities as an indication that the amounts so invested were not needed in the operation of taxpayer's business and that investment in unrelated corporations is evidence that the accumulations were beyond the reasonable need of taxpayer's business. These securities, however, were readily saleable and taxpayer could have quickly converted these securities into cash.

■ The evidence is insufficient to support a finding that the Commissioner met the burden of showing that taxpayer permitted earnings and profits to accumulate beyond the reasonable needs of the business. Nevertheless, the question of whether taxpayer was availed of for the purpose of avoiding the imposition of a surtax upon its shareholders by permitting earnings or profits to be accumulated instead of distributed must be considered.

■ Although Section 102 should be rigorously applied to make it impossible for individuals to abuse the corporate form for the purpose of lowering their individual tax rates, the Commissioner may not use Section 102 as a device to enable him to look over the shoulder of the corporate manager and assess a penalty any time the Commissioner believes that a corporation has not been generous in its dividend policy or has temporarily invested its surplus in a manner not entirely acceptable to the Commissioner.

The Tax Court minimized the importance of the "reasonable business needs" issue and said, "In the final analysis, however, reasonableness of the accumulation is merely a subsidiary consideration, the ultimate question being whether the taxpayer is availed of for the purpose proscribed by the statute. Young Motor Co., 32 T.C. 1336 (1959), on appeal (C.A.I.)." (34 T.C. 41, 51–52.)

The Tax Court's reliance upon its previous opinion in the Young Motor case is misplaced; it caused the Court to lose sight of the importance of the question of whether the accumulations were beyond the reasonable needs of taxpayer's business, although it did find on inadequate evidence that the accumulations were unreasonable. The First Circuit reversed the Young Motor decision after the Tax Court's opinion in this case was filed. Young Motor Co. v. Commissioner,

1 Cir., 1960, 281 F.2d 488. The First Circuit indicated that, although there may be cases in which the forbidden motive for accumulating earnings and profits exists where the accumulations are not beyond the reasonable needs of the business (and thus the surtax prescribed by Section 102(a) must be imposed), in the normal case a determination that accumulations were not unreasonable in the light of the needs of the business amounts to a finding favorable to the taxpayer on the most persuasive fact which would show that the corporation was not availed of for the purpose of preventing the imposition of a surtax upon its shareholders through the medium of permitting earnings and profits to accumulate instead of being divided or distributed. Cf. United States v. R. C. Tway Coal Sales Co., 6 Cir., 1935, 75 F.2d 336, 337; United Business Corp. of America v. Commissioner, 2 Cir., 1933, 62 F.2d 754, 755.

In the opinion of the Tax Court and of the Commissioner as evidenced by his arguments here, the primary issue to be determined was whether taxpayer's purpose in not distributing its earnings and profits was to minimize the taxes on the individual incomes of the shareholders. Both the Tax Court and the Commissioner appear to find proof that the proscribed purpose existed in the fact that taxpayer's shareholders would have paid more taxes on their individual incomes if the earnings and profits for the years in issue had been distributed to them. But such a showing fails to prove that the forbidden purpose was a motivating force in the decision not to distribute. An identical situation could be found in every Section 102 case except where the shareholders of the taxpayer-corporation had net losses in excess of the amount earned by their corporation.

Moreover, the Tax Court erringly relied upon the fact that taxpayer was a closely held corporation and that it could arrange financing from another corporation controlled by Roland Gsell to support its finding that taxpayer was availed of for the proscribed purpose. It is only the closely held corporation or the publicly held corporation which is controlled by a small group of persons which runs any real risk of being subjected to the surtax imposed by Section 102. Furthermore, the taxpayer chose not to put itself in a position where it would have to rely on outside financing to continue its operations falls far short of proving that it was availed of for the purpose of preventing the imposition of the surtax.

The Tax Court's findings warrant the conclusion that taxpayer was not availed of for the prohibited purpose. Taxpayer proved that (1) earnings were retained to meet the needs of its business; (2) reasonable salaries were paid its shareholder-employees; (3) corporate funds were not used by stockholders as their own; (4) taxpayer's chief stockholder engaged in various activities relating to other corporations in which he was a major stockholder which led to the declaration of dividends. Together with the Commissioner's failure to show that accumulations were unreasonable in light of taxpayer's business needs, these factors overcome the presumption of correctness of the Commissioner's determination that taxpayer was availed of for the purpose prohibited by Section 102.

Finally, the Commissioner contends that this court should not reverse the Tax Court in a Section 102 case because the findings of unreasonable accumulations and of the existence of the forbidden purpose are findings of fact which are to be respected by a Court of Appeals unless "clearly erroneous." Fed. Rules Civ.Proc. rule 52(a), 28 U.S.C.A.; 26 U.S.C.A. § 7482(a). The Supreme Court has said, "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 1947, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; see also Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 290–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; Casey v. Commissioner, 2 Cir., 1959, 267 F.2d 26;

**328**

Gillette's Estate et al. v. Commissioner, 9 Cir., 1950, 182 F.2d 1010, 1014.

The Commissioner having failed to submit adequate evidence to carry the burden of persuasion that taxpayer permitted the earnings and profits to accumulate beyond its reasonable needs, and, there being convincing evidence that taxpayer was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings and profits to be accumulated instead of being divided or distributed, we are left with the firm conviction that a mistake has been committed.

The decision of the Tax Court imposing a surtax under Section 102 is reversed.