**ELECTRIC REGULATOR CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 391, Docket 28609.

United States Court of Appeals Second Circuit.

Argued April 7, 1964.

Decided Aug. 11, 1964.

**340**

Zalkin & Cohen, New York City (Robert J. Feldman and Irving Evall, New York City, of counsel), for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen. (Lee A. Jackson, David O. Walter and Jeanine Jacobs, Attys., Dept. of Justice, of counsel), for respondent.

Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge:

Electric Regulator Corporation (petitioner) petitions for a review of a decision of the Tax Court of the United States, 40 T.C. 757 (1963), sustaining the Commissioner's determination of deficiencies in income tax for its fiscal years 1957 and 1958 in the amounts of $81,751.-01 and $25,944.69. These deficiencies resulted from the Commissioner's imposition of an accumulated earnings tax pursuant to Internal Revenue Code of 1954, § 531 [1] for each of the years in question. The Tax Court found that petitioner permitted its earnings and profits to accumulate beyond the reason-

---

1. Section 531 provides:
"§ 531. Imposition of accumulated earnings tax
"In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation de-scribed in section 532, an accumulated earnings tax equal to the sum of—
"(1) 27½ percent of the accumulated taxable income not in excess of $100,-000, plus
"(2) 38½ percent of the accumulated taxable income in excess of $100,000."

able needs of its business [2] and that it was availed of during the years in question for the purpose of avoiding the income tax with respect to its two shareholders by permitting earnings to accumulate instead of being divided and distributed.[3] Upon the facts and the law, we think the determination of the Tax Court clearly erroneous and therefore reverse.

Petitioner was organized as a New York corporation in 1945 and since then has been successfully engaged in the manufacture of electric regulating devices. The history of its growth and the use of its earnings to achieve that growth is important to a proper disposition of this case. In its early years (1945–1948), petitioner occupied only 400 square feet of floor space in New York City, from 1948 to 1950, 1200 square feet, and from 1950 to 1952, 7500 square feet. In 1952 petitioner moved from New York to Norwalk, Connecticut, where it now maintains its principal business location. The size of the Norwalk plant, originally 16,000 square feet, was substantially increased in 1958 to 29,000 square feet. As reflected in its balance sheets, the investment in petitioner's plant, machinery and equipment (before depreciation) had grown steadily from $9,172 in 1948 to $469,347 at the end of the 1958 fiscal year.

Petitioner's principal product over the years, 1945–1957, had been its patented electromechanical voltage regulator, called "Regohm." Because of its size (about two inches on all sides), weight (three or four ounces) and other features, many sizeable motor manufacturers favored the Regohm over competing devices and it has enjoyed considerable commercial success.

Petitioner's cost for Regohm's component parts was seven or eight dollars. The manufactured product was sold for approximately thirty-five dollars. Technological advances led to the gradual decline in the demand for the Regohm, however, and as a result, early in 1955 petitioner began to develop the "Magohm" to market along with the Regohm. The newer product, a static type regulator, measured about one cubic foot and weighed approximately thirty-five pounds; the component parts cost about $100 and it was sold for $350. Naturally, the Magohm called for far greater inventories and manufacturing space than did the Regohm, a major factor in the 1957 decision to substantially increase plant facilities. Sales of Magohm devices accounted for only $6,000 of $1,462,000 sales in fiscal 1956. However, in fiscal 1957 $238,000 of $2,624,000 sales were attributable to Magohm and by 1958 it had accounted for $639,000 of $2,016,000 sales. Petitioner also developed two other products, the "Teleregister" and the unsuccessful "Rotojet."

Since its inception, petitioner's sole shareholders have been Arthur M. Cohen, President and Chief Engineer, and Paul W. Fink, Treasurer and Chief Fiscal Officer. Their only contribution to the capital of petitioner was their initial investment of $2,180 in 1945. Two thousand dollars in preferred stock was subsequently retired, thus leaving a capitalization of $180 in common stock. In 1952 and again in 1957, however, the capital stock account was increased, first to $50,000, then to $540,000. In each case earned surplus was reduced by the appropriate amount and a non-taxable dividend in

2. Section 533(a) provides:
   "§ 533. (a) Unreasonable accumulation determinative of purpose.—
   "For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary."

3. Section 532(a) provides:
   "§ 532. (a) General rule.—
   "The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed."

common stock was declared. The salaries of petitioner's officers, Cohen and Fink, from 1955 through 1959 were:

| Fiscal Year | Cohen | Fink |
|---|---|---|
| 1955 | $40,000.00 | $11,000.00 |
| 1956 | 67,949.01 | 26,966.01 |
| 1957 | 65,000.00 | 43,500.00 |
| 1958 | 63,607.15 | 27,404.77 |
| 1959 | 56,029.45 | 22,352.97 |

No taxable dividend has ever been declared or paid by petitioner.

During the fiscal years 1957 and 1958, petitioner held no investments in securities or other assets not directly related to its business. And during these years it made no loans to shareholders or members of their families with the exception of one $3,000 loan to Fink which was promptly repaid.

Petitioner's profit and loss statements for the fiscal years 1955 through 1959 reveal net income, after taxes and profit-sharing, in the following amounts: $52,543 (1955); $83,884 (1956); $261,524 (1957);[4] $89,027 (1958); $73,017 (1959). Balance sheet assets figures for the same years were: $694,478 (1955); $833,417 (1956); $1,423,701 (1957); $1,138,195 (1958); $1,156,285 (1959). Reflected in these balance sheet figures are the following amounts which are of particular importance:

| Year Fiscal | Working Capital (net current assets) | Total Current Assets | Cash | Earned[5] Surplus |
|---|---|---|---|---|
| 1955 | $363,951 | $ 550,370 | $348,108 | $474,139 |
| 1956 | 408,387 | 679,944 | 163,116 | 532,663 |
| 1957 | 618,723 | 1,219,292 | 820,898 | 754,191 |
| 1958 | 611,864 | 864,104 | 439,243 | 848,006 |
| 1959 | 620,575 | 844,653 | 317,013 | 932,026 |

Petitioner responded to the Commissioner's section 534(b) notification with a timely statement of the grounds on which it relied to establish that its earnings and profits had not accumulated beyond the reasonable needs of its business pursuant to section 534(c). The Tax Court held, and the Commissioner does not now challenge, that petitioner's statement was sufficient to shift to the Commissioner the burden of proving that earnings and profits had, in fact, been unreasonably accumulated. See R. Gsell & Co. v. Commissioner, 294 F.2d 321, 326 (2d Cir. 1961).

One of the grounds on which petitioner relied to show that earnings had not been unreasonably accumulated was the expansion of the Norwalk plant. The Tax Court found that during September and October of 1957 the second story addition to the Norwalk installation was under active consideration. An architect had prepared preliminary sketches and had informed one of petitioner's officers that the cost would be in the neighborhood of $125,000. The estimated cost of additional machinery, office furniture and fixtures was put at $100,000. During fiscal 1958 $69,000 was actually spent on construction and $52,000 on machinery and equipment. In fiscal 1959 construction was completed at an additional cost of $40,000 while another $52,000 was expended for equipment. Petitioner also relied on its expectations at the end of each of the years in question that substantial amounts might have to be refunded to the

---

4. This disproportionately large amount is explained in part by unusually large net sales of $2,623,676, as compared with net sales of $1,462,518 for 1956 and $2,016,033 for 1958.

5. Earned surplus figures have been adjusted by restoring the amounts of the two nontaxable stock dividends of $49,820 (1952) and $490,000 (1957).

Government under the terms of the Renegotiation Act of 1951. Its estimate for 1957 was $30,000 and $26,766.38 of that amount was eventually paid out in 1959. For 1958 petitioner estimated that it would be liable for a $20,000 refund. None of this amount was ever paid, however, because the Renegotiation Board in its discretion granted petitioner an exemption.

Other grounds on which petitioner relied in the Tax Court included the assertion that it was entitled to maintain a working capital reserve in cash of $430,000 for the 1957 fiscal year and $379,000 for fiscal 1958. In addition, petitioner urged that general economic conditions, its position as a small entity in an industry dominated by larger competitors, its desire to develop new products, to show a more favorable balance sheet and to enter new commercial markets justified its retention of earnings and profits. Finally, petitioner contended that, in fact, it lacked sufficient cash with which to pay a dividend.[6]

The rationale underlying the Tax Court's holding that the Commissioner had met the burden of proving the unreasonableness of these grounds is plain. It first found that petitioner did in fact anticipate at the end of fiscal 1957 expenditures for fiscal 1958 of $150,000; e. g., $70,000 (plant construction), $50,000 (plant machinery and equipment) and $30,000 (renegotiation refund). With this figure the court compared petitioner's accumulated earnings as of October 31, 1956 ($532,663) and earnings and profits of fiscal 1957 ($261,524) and concluded:

> "Thus, petitioner had an ample 'cushion' in the surplus accumulated from prior years with which to absorb the * * * anticipated needs of its business which total only $150,000. It was not required therefore to accumulate further earnings and profits from the 'current year' * * * to meet such needs."[7]

The second ground (need for working capital) was rejected on the basis of similar reasoning: that petitioner's continuous profits, substantial unfilled orders and large cash balance made further accumulation unnecessary. "In our judgment," said the Tax Court, "anticipated working capital requirements could be amply cared for by its accumulations from prior years plus the cash generating transactions of its going business." The court also found that with over $530,000 in accumulations, even the most conservative approach would not warrant further retention of earnings because of general economic conditions and petitioner's particular competitive situation. As to petitioner's final ground, lack of cash, the court looked to the existing cash account and the anticipated revenues for the next succeeding years and in each case concluded that the cash balances were sufficient.

The crux of petitioner's argument on appeal is three-fold: first, petitioner argues that the Tax Court considered only the sum total of its earned surplus in determining that further accumulations exceeded the reasonable needs of the business, and erroneously failed to examine the manner in which that surplus had been translated into plant expansion, new machinery and equipment and other working assets; second, in fact its liquid position was wholly inadequate to pay the dividend thought by the Tax Court to have been warranted; third, petitioner contends that the evidence did not establish that it has been availed of for the prohibited purpose.

■ We believe that the Tax Court's approach to the problem of the reasonableness of the 1957 and 1958 accumulations was erroneous. We cannot agree that a purely mechanical comparison of the total retained earnings of prior years and current profits with the reasonably anticipated needs of the business is at all meaningful apart from a consideration of

---

6. The grounds on which petitioner relied were substantially the same for 1957 and 1958.

7. The Court's rationale for rejecting the 1958 grounds was the same.

the nature of the accumulated surplus. The Tax Court's assumption that a retained earnings account (regardless of nomenclature) invariably represents a readily available source of liquid funds with which to satisfy existing and anticipated corporate obligations and to pay dividends is unsound.[8] As a practical matter, a retained earnings account may embody a cross-section of the assets of the corporation. See Paton & Dixon, Essentials of Accounting 652–653, 667–668 (1958). Particularly is this true where, as here, the corporation's growth has been financed through its own earnings rather than through additional shareholder investment or borrowing.[9] The governing principle is cogently stated in Smoot Sand & Gravel Corp. v. Commissioner, 274 F.2d 495, 501 (4th Cir.), cert. denied, 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011 (1960) : "[T]o the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity." See also Kimball Milling Co., 11 CCH T.C.Mem. 219, 223 (1952) ; Syracuse Stamping Co., 4 CCH T.C.Mem. 371, 375 (1945). In effect, the Tax Court, after referring to Smoot, completely disregarded this basic proposition. The use to which petitioner has put its previously accumulated earnings, as well as its anticipated needs, section 537, Int.Rev.Code of 1954, is an altogether essential consideration in determining that earnings and profits have been accumulated beyond the reasonable needs of the business. The accumulated earnings which had been converted into brick, mortar, machinery, equipment and inventory were scarcely available for current expenses or expansion.

In addition to finding that accumulated earnings and profits provided a sufficient "cushion" for present and future needs, the Tax Court concluded that petitioner had adequate cash with which to pay out all of its 1957 and 1958 net earnings in dividends. We conclude that this holding was also clearly erroneous. Again, it is apparent that balance sheet totals rarely, if ever, tell the whole story. Only after close analysis of the nature of the cash account and the present and anticipated demands which it will be forced to meet, can a trier of fact venture a finding that the liquid assets justify the declaration of a dividend. Nothing in the Internal Revenue Code prohibits large cash balances where the taxpayer has sufficient need for the cash in its business. Although it maintained a cash account of substantial magnitude, the evidence is plain that petitioner's needs for cash were real and that any accumulation was fully justified. Thus, even at the end of fiscal 1957, when the cash balance was unusually large compared with the balances of 1956 ($163,116) and 1958 ($439,243), petitioner anticipated substantial current liabilities: Accrued expenses (payroll, etc.), $75,989; Mortgage amortization, $5,000; Federal income taxes payable, $268,949; State franchise taxes, $20,000; Profit sharing plan payment, $119,616; Officers' compensation payable, $70,000; Christmas bonus to employees, $30,000. These anticipated obligations left a cash balance of approximately $231,000. That these estimates were entirely realistic is supported by the Tax Court's findings since the actual cash balance six months later, April 30, 1958, had fallen to $190,000.

The Tax Court recognized that petitioner was faced with large current li-

---

8. "The question is primarily one of determining whether the company has enough liquid funds (*not* surplus) to meet estimated needs, including demands for working capital, plant expansion, and all reasonable contingencies." Cary, The Penalty Tax on Accumulated Earnings in Lasser, Encyclopedia of Tax Procedures 816 (1956).

9. Petitioner submits, that after making the proper deductions from surplus for amounts previously transformed into plant, equipment, inventories and receivables, net surplus for fiscal years 1957 and 1958 totalled approximately $150,000.

abilities,[10] but reasoned that cash generating transactions in the succeeding year could be taken into consideration thus permitting distribution of the profits in each year. However, again from its own findings, even if actual 1958 earnings were included in the 1957 year-end totals, petitioner's liquid position was wholly inadequate to defray the payment of the dividend thought warranted by the Tax Court.

Cash available, October 31,
1957, after payment of
current liabilities ........$231,000
Net income, fiscal 1958 ......  89,000

    Net cash available .....$320,000

Less:
Dividend Tax Court held
should have been paid for
fiscal 1957 .............$241,000 [11]
Expense of factory addition
anticipated for 1958 ....  70,000
Machinery and equipment ...  50,000
Refund of excess profits .....  30,000
Inventory increase in fiscal
1958 ................  16,000

    Total ...............$407,000
Cash deficit had dividend
been paid .............  $(87,000)*

Petitioner has undertaken a comparable analysis for the fiscal year 1958 and again, even without a reserve for operating expenses, a deficit results.

■■ Upon these fact findings in our opinion the Tax Court clearly erred in concluding that the Commissioner had met his burden of proving that the accumulations of earnings and profits were beyond the reasonable needs of the business. Left for review is the "ultimate" finding that petitioner was availed of during the tax years involved for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed. While the "evidentiary corollary" established by section 533(a) is as a practical matter often considered apart from the more basic question framed in section 532(a), the two issues are largely interdependent. "[A] determination that accumulations were not unreasonable in the light of the needs of the business amounts to a finding favorable to the taxpayer on the most persuasive fact which would show that the corporation was not availed of for the purpose of preventing the imposition of a surtax upon its shareholders * * *." R. Gsell & Co. v. Commissioner, supra, 294 F.2d at 327; see Young Motor Co. v. Commissioner, 281 F.2d 488 (1st Cir. 1960).

Petitioner's rapid and well-managed growth in a highly competitive industry hardly presents the picture of a tax-saving device. Its earnings have not been allowed to lie fallow; rather, they have been plowed back into the corporation in the form of new plant and other income producing assets. It has developed new product lines and actively sought to expand its markets, compare Smoot Sand & Gravel Corp. v. Commissioner, supra, 274 F.2d at 497–498.

The Tax Court points to the fact that since 1948 petitioner had realized a substantial profit in each year yet had declared no taxable dividend. But had its earnings been paid to its stockholders, how could petitioner have grown in size from a company with an original investment of $2,180 to a company conducting a substantial operation with over a million dollars of assets? In answering the question: what are the reasonable needs of the business?, the corollary question arises, namely, what "business"? If the Treasury decides that the manufacture of "Regohm" is the "business," then it would forever consign petitioner to the manufacture of that product and view its needs accordingly. Courts, however,

10. Indeed, the Tax Court estimated current liabilities at the end of fiscal 1957 at $600,500.

11. Although net earnings for fiscal 1957 were actually $261,254, the deficiency was computed on an adjusted figure of $240,-912.

* All figures rounded off.

must not blind themselves to the realities in this age of rapid technological change. The product of today is frequently outmoded tomorrow. The results of research in the electronics, pharmaceutical and chemical fields alone justify this statement. Nor is it always possible for a company in advance to set aside a specific sum to achieve a specific goal. Comments made in the past to the effect that a definite plan actually followed through must be on the company's books and records before moneys assigned thereto become anticipated needs may have to be appropriately qualified in particular cases.

If the Tax Court's views here were to be accepted, they would give to the Treasury virtually absolute power to stifle or encourage economic growth as it—not the corporate directors—decided how each company should handle its corporate and financial affairs.[12] The Courts are not unmindful of the efforts of the Department of Justice through its Anti-Trust Division to encourage competition by attacking monopolistic practices which might be harmful to smaller units of industry, and of Congress' decided interest in small business and its development.[13] It would be anomalous indeed were the Treasury to have the power to thwart these praiseworthy objectives. But equally praiseworthy is (and should be) the Treasury's vigilance lest a corporation, particularly a private or family-owned corporation with only a few stockholders, be used to prevent the imposition of high taxes on such stockholders.

To resolve this possible conflict, a careful examination of the facts of each case must be made. The circumstances in a number of cases decided by this court in recent years are markedly different from those found here. In The Factories Investment Corp. v. Commissioner, 328 F.2d 781 (2d Cir. 1964) neither dividends nor salaries were ever paid. In Oyster Shell Prods. Corp. v. Commissioner, 313 F.2d 449 (2d Cir. 1963), loans were made to shareholders, and investments were made in the stock of unrelated corporations. In Youngs Rubber Corp. v. Commissioner, T.C.Mem. 1962–300, aff'd, 331 F.2d 12 (2d Cir. 1964) large reserves were kept accumulated for personal, not corporate, purposes and moneys were set aside for specific uses which never materialized. On the other hand in R. Gsell & Co., supra, the need for the accumulation was obvious.

▉ Mindful of the possibility of the misuse of the corporate form and the careful examination which must be made when no dividends have been declared by those in control of a closely-owned corporation, we have, under these facts, no hesitancy in declaring our "definite and firm conviction" that the Tax Court was in error in concluding that petitioner was availed of for the prohibited purpose. See United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 625, 92 L.Ed. 746 (1947). The purpose of the section 531 surtax is to discourage individual taxpayers from abusing the corporate form for the purpose of decreasing their personal income tax liability, not to

---

12. The Tax Court itself has not subscribed to such an interpretation of the law. In Fotocrafters, Inc., 19 CCH Tax Ct.Mem. 1401, 1408–1409 (1960), it stated:

> Respondent argues that the fact that petitioner's earned surplus steadily increased from April 1, 1954, shows that the accumulations of earnings beyond this date were unnecessary. His understanding of corporate accounting is obviously confused. For, if an increase in earned surplus, of itself, showed that an accumulation was improper we would have to condemn every corporation

> which financed growth through current earnings and we could justify accumulations only where a corporation suffered operating losses. What respondent overlooks is that the employment of working funds within a business to purchase fixed assets is not an occasion for a charge against earned surplus. Rather, it decreases working capital. That this decrease appeared likely to and did occur here we regard as highly significant.

13. E. g., 15 U.S.C.A. § 631 et seq.

award the Commissioner an *ex post facto* veto over the decisions of the board of directors. In our opinion, petitioner's dividend policy reflected an appropriate exercise of the managerial function, dictated by the needs and interests of the corporation.

The order and decision of the Tax Court is reversed with directions to enter judgment for the petitioner.