The **DAHLEM CONSTRUCTION COMPANY, Plaintiff,**

v.

The **UNITED STATES of America, Defendant.**

**No. 5117.**

United States District Court
W. D. Kentucky,
Louisville Division.

June 20, 1966.

---

James W. Hendricks, of Marshall, Cochran, Heyburn & Wells, Louisville, Ky., for plaintiff.

Robert F. Sama, Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT
## and
## CONCLUSIONS OF LAW

JAMES F. GORDON, District Judge.

This action is a claim for refund by The Dahlem Construction Company (hereinafter sometimes referred to as the "Taxpayer"), arising out of deficiencies assessed against that company for the fiscal years ending March 31, 1960, 1961 and 1962. There are two entirely separate issues:

1. The Commissioner of Internal Revenue (hereinafter referred to as the "Commissioner") determined that the taxpayer's accumulated earnings and profits as of March 31, 1959 were adequate for all of taxpayer's reasonable needs, including its reasonably anticipated future needs. Therefore, the Commissioner assessed the penalty tax provided for in Section 531 of the Internal Revenue Code for the fiscal years ending March 31st, 1960, 1961 and 1962. The total deficiencies for these three years amounted to $38,161.59. This amount together with $8,216.02 interest, was paid by the taxpayer on September 14, 1964. In this suit the taxpayer seeks judgment for $46,377.61 (38,161.59 plus 8,216.02), plus interest from September 14, 1964.

2. The Commissioner also determined that a portion of the salary received by Bernard A. Dahlem, an officer and director of taxpayer for the fiscal years ending March 31, 1960, and March 31, 1961 was in excess of the fair and reasonable value of the services rendered by him to taxpayer. The amount of this deficiency determined against the taxpayer by the Commissioner, including interest, was $19,833.91. Taxpayer paid this amount on September 14, 1964. On this issue the taxpayer seeks to recover $19,833.91, with interest from September 14, 1964.

The Court finds that taxpayer has successfully met its burden of proving that no portion of its earnings and profits for the three fiscal years in issue had been permitted to accumulate (instead

of being divided or distributed) for the purpose of avoiding the income tax with respect to its shareholders. The Court further finds that all of the earnings and profits for the three fiscal years in issue were needed in the taxpayer's business.

On the second issue the Court finds Mr. Bernard A. Dahlem's total compensation in the amount of $15,868.69 for the fiscal year ending March 31, 1961, did not exceed the fair and reasonable value of his services for that year. For the fiscal year ending March 31, 1960, the Court finds that the total compensation received by said Mr. Dahlem in the amount of $45,274.83, exceeded the fair and reasonable value of his services for that year and further finds that a reasonable compensation for that year to Mr. Dahlem is $32,000.00.

Counsel for the Government and for taxpayer have been directed by the Court to compute the total amount of refund, plus interest, due and to tender a judgment in that amount to the Court.

By agreement of counsel, the interrogatories and answers, together with the exhibits attached thereto, have been stipulated, and are incorporated herein by this reference.

## I.

### FINDINGS OF FACT, RE: ACCUMULATED EARNINGS TAX

The plaintiff, The Dahlem Construction Company, is a corporation organized on March 28, 1946, under the laws of the State of Kentucky, with its principal office in Louisville, Kentucky. Its federal income tax returns for its fiscal years ending on March 31, 1960, 1961 and 1962 were filed with the District Director of Internal Revenue at Louisville, Kentucky. The Dahlem Construction Company is engaged in business as a general building contractor. Prior to its incorporation in 1946, taxpayer was operated as a proprietorship by Joseph C. Dahlem, who is now Chairman of the Board. Mr. Dahlem started the construction business in 1930 with a capital of $800. By 1946 when the Construction Company was incorporated, its net worth had grown to $62,500.

After incorporation the company's net worth was represented by stock issued in the amount of 1,000 shares of $10 par common stock and 5,250 shares of $10 par preferred stock. Mr. Joseph C. Dahlem initially owned 960 of the 1,000 shares of common and all of the preferred. By March 31, 1962, the last year at issue in these proceedings, the corporation had outstanding 25,000 shares of common stock, representing 250,000 book value, and 5,650 shares of preferred, representing a book value of $56,500. In addition, the company had acquired a surplus of $273,153, and therefore had a total net worth of $579,653. This growth in net worth through the years had been achieved from the earnings and profits of the corporation since there had been no further investment of capital by any of the shareholders.

The company declared a nine for one stock dividend in 1950, increasing the book value of the common stock from $10,000 to $100,000; and again in 1955 a one and a half to one stock dividend was declared, which resulted in raising the book value of the common stock to its present $250,000, with 25,000 shares outstanding. Of this amount of common shares, Mr. Joseph C. Dahlem now owns (and also owned during the tax years in question) 21,256½ shares, or approximately 85% of the shares outstanding. Mr. Dahlem's son, Bernard A. Dahlem, now owns (and owned during the years in question) 2,610 shares of the common stock, or a little more than 10%. The balance of the shares of the common stock were owned by other members of the Dahlem family, and officers of the company, none of whom owned shares representing more than 1% of the total shares outstanding.

The corporation has regularly paid its 5% dividend on its preferred shares from the time of the corporation's inception to the present.

In 1948, 1949 and 1950 the taxpayer declared a 6% cash dividend on the par value of its common stock, but other than the stock dividends above-mentioned, no further dividends were declared until the fiscal year ending March 31, 1962, at which time a $15,000 dividend was declared, again representing 6% of the $250,000 par value of common stock outstanding.

The officers and directors of the corporation testified at the trial that the dividend for 1962 and subsequent years was declared, against the advice of the corporation's banker, CPA, and lawyer, in order to attempt to placate the federal revenue agents, who were putting pressure on the company because of its failure to declare cash dividends on its common stock. The company continued to declare this same $15,000 dividend for the fiscal years ending March 31, 1963, 1964 and 1965.

The financial history of this company, including the factors leading to the adoption of the dividend policy it has pursued, is well documented in the corporation's minute book, which has been introduced in evidence.

The Dahlem Construction Company has specialized to a substantial degree in building shopping centers and other types of commercial buildings for speculative developers. Considerable evidence was adduced at the trial concerning the speculative nature of this type of construction business, and the risks which taxpayer incurred in commencing the construction of large and small developments before the owners had completed all of the technical requirements necessary for the acquisition of mortgage funds from lending institutions. Examples were given, which occurred during the tax years in question, as well as prior to and since those years, in which taxpayer had expended hundreds of thousands of dollars toward the completion of developments, and the difficulty it had subsequently (sometimes running over a period of a number of months) in collecting from the owner for the work that had been completed.

This was particularly true of the numerous shopping centers that taxpayer has constructed over the years. Shopping centers are financed by first obtaining a commitment letter, generally from an insurance company, for the amount of the construction cost, and the amount to be advanced by the insurance company on the commitment is contingent upon the developer obtaining leases for the stores to be erected. As a practical matter it is usually difficult to obtain many of these leases until construction has been started. Since the lending institution that issues the commitment letter will not pay out its funds until after the shopping center is completed and the tenants are in possession, the procedure generally followed is to take the commitment letter to a bank, which, in turn, advances the money to pay construction costs at the end of each thirty-day period. The bank, of course, expects to be repaid for the money advanced during the course of construction by the proceeds from the mortgage loan of the insurance company which issued the commitment letter. In a number of instances it became necessary for taxpayer to guarantee to the bank that it would complete the shopping center, even though the funds might not be forthcoming from the insurance company because the developer had not obtained the necessary leases. This, of course, required that taxpayer have considerable financial strength.

These financing problems led the taxpayer and its officers to work very closely with the officials of the Citizens Fidelity Bank & Trust Company, in Louisville, and one of the Bank's senior vice presidents, Arthur G. Baumann, constantly advised the company on its financial problems inherent in the type of financing described above, and attended many of the company's directors' meetings. He consistently advised against the payment of any dividends, and, indeed, strenuously objected when the 6% cash dividend was declared in 1962. Similarly, the company's auditors and lawyers consistently recommended

against payment of any dividends, in order to build up the corporation's net worth to protect it against the risks incurred by all general contractors, particularly in view of the fact that this construction company was erecting buildings for many speculative builders.

In analyzing the corporation's financial affairs, Mr. Baumann, and others, testified that when a general contractor has a colume of business which exceeds five, or at the most six, times its net worth, the company's financial affairs become a matter of concern. As do many general contractors, this taxpayer's volume of business fluctuates substantially, so that its annual volume for the period, for example, 1956 through 1965, varied from a low of $1,200,000 in 1962, to a record high of just under $4,000,000 in 1960. In the year ending March 31, 1960 (which is one of the years in question in these proceedings), the company had a net worth of just over $500,-000, which represents a ratio of volume to net worth of nearly eight to one. Mr. Baumann and others testified that such a ratio was dangerous and of concern to him in his capacity of vice president of the Citizens Fidelity Bank & Trust Company.

Similarly, the company's current ratios were discussed. This is the ratio of current assets to the current liabilities. Although the company's current ratio in 1962 reached a high point of approximately four to one, this was a bad year for the company's business in which it produced only $1,200,000 in volume. The years of higher volume (for example, in 1960) the company's current ratio was around, and generally under, two to one. Mr. Baumann and the other witnesses considered such ratios indispensable to the reasonable needs of the business.

The extreme fluctuations in the company's cash position is shown by plaintiff's Exhibit #4, containing weekly bank balances from the first of April, 1959, through the end of March, 1965. These balances varied from a high point of $623,216.67, on October 24, 1959, as contrasted with at least eighteen occasions in eighteen different weeks where the company's cash balances dipped below $100,000, with a low point of $32,381.24 on June 30, 1961.

The company also had had occasional investments in short-term treasury certificates and savings and loan accounts, and since 1960 has owned listed securities at a cost of some $80,000. The details of these securities are shown in the interrogatories. The treasury notes and the amounts invested in savings and loans are generally held for short periods of time during periods when business was slow, such as in the winter time, and the cash requirements of the company were not as large as they are during periods of heavy construction requirements.

The Court finds that the cash balances carried by this company, as well as its investments were required by a company operating at the volume of the Dahlem Construction Company, in the light of the risks inherent in the construction business. Several witnesses testified that the company's cash needs in its business would run as high as $600,000 per month during months of active construction. The Court further finds that the company's cash, listed securities, and other assets equivalent to cash, were just sufficient to finance such a monthly volume of business.

Also adduced at the trial was considerable evidence as to the requirements of bonding companies before bonds would be issued. In order to obtain a bid bond, or qualify for a performance bond, a rule of thumb adopted by most of the surety industry is that net liquid assets (or working capital) should be at least 10% of the work program contemplated by the contractor to be bonded. For example, $100,000 of working capital would qualify for a work program of $1,000,000, including both the unfinished work on hand at the time of the bid, plus the amount of the bid. In the years in question the working capital of the taxpayer was around $400,000.

With the annual volume of this company running in some years up to $4,-

000,000, the taxpayer's work program in any given time could easily equal $4,000,000, or more, and therefore the company could not qualify for a bond for additional work, since its working capital would be inadequate to support any increased work program. Even though the type of business performed by the taxpayer in many instances did not require a bond, the evidence clearly established that a prudent contractor should be prepared to provide a bond if necessary. At least one example was given where the taxpayer was refused a bond because of inadequate working capital.

Numerous witnesses testified to the importance to a general contractor of accumulating earnings and profits in order to provide it with adequate working capital to expand its business. This company has had a very substantial growth through the years without the necessity of seeking investment capital from outside sources. It should be permitted to continue to grow without subjecting itself to penalty taxes for failure to pay dividends on the accumulated earnings it needs in its business.

## II.

### FINDINGS OF FACT RE: SALARY OF BERNARD A. DAHLEM

The Commissioner of Internal Revenue disallowed a portion of Mr. Bernard A. Dahlem's compensation for the fiscal years ending March 31, 1960 and March 31, 1961, by reducing the amount of that compensation so that it equaled the compensation received by Edward J. Merkel, another one of the company's employees.

It is not logical to compare Mr. Merkel's salary with that of Mr. Bernard A. Dahlem's salary. The evidence clearly established that Mr. Merkel had no supervisory direction, had no responsibilities for company policy, made no sales and borrowed no money, and was not a registered engineer. In contrast Mr. Bernard A. Dahlem had substantial responsibility in all of these fields, and

was a registered engineer. However, the total compensation received by Mr. Bernard A. Dahlem in the fiscal year 1960 in the total amount of $45,274, even though 1960 was a record year for the company and Mr. Dahlem had contributed substantially to the company's record volume, was disproportionate to the total compensation received by him in other years. Furthermore, Mr. Dahlem was only in his early thirties and had only been back from the Service for four years. The Court therefore feels that a reasonable compensation for Mr. Bernard A. Dahlem, for the fiscal year ending March 31, 1960, including the contribution made by the company on his behalf to the profit-sharing plan, is $32,000.

For the fiscal year ending March 31, 1961, Mr. Bernard A. Dahlem received total compensation in the amount of $15,869. The Court feels that the Commissioner was being extremely technical in reducing this amount, particularly in view of the fact that it is some $4,000 less than the amount allowed by the Commissioner in 1960. The Court therefore, finds that the $15,869.00 paid to Mr. Bernard A. Dahlem in the fiscal year ending March 31, 1961, was reasonable.

### I—CONCLUSIONS OF LAW ACCUMULATED EARNINGS TAX

The plaintiff is seeking a refund for taxes paid pursuant to the assessment of a deficiency imposed by the Commissioner of Internal Revenue under Sections 531 and 532 of the Internal Revenue Code of 1954, for each of the taxable years, March 31, 1960, March 31, 1961, and March 31, 1962.

Section 531 provides for a penalty tax in the amount of $27\frac{1}{2}\%$ of the accumulated taxable income not in excess of $100,000 for each of such taxable years. Section 532 provides that the penalty tax shall apply to corporations "availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed". Section

533(a) provides that "[f]or purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary". Section 537 provides that the "term 'reasonable needs of the business' includes the reasonably anticipated needs of the business".

■ For the reasons set forth in our Findings of Fact, we feel that the taxpayer has met its burden of proving that its earnings and profits were not retained for any purpose other than to meet the reasonable needs of the corporation's business. We further find that the corporation was not availed of for the purpose of avoiding the income tax with respect to its shareholders. Electric Regulator Corporation v. Commissioner, 2 Cir., 336 F.2d 339; Vuono-Lione, Inc. 65,096 P-H Memo TC, p. 65–556; Oman Construction Company, Inc., 65,326 P-H Memo TC, p. 65–1968.

## II—CONCLUSIONS OF LAW
### BERNARD A. DAHLEM'S SALARY

■ The determination of reasonable compensation for officers of a corporation is primarily a matter of finding of fact by the Court, with the Court keeping in mind the admonition contained in the cases that the Court give full consideration to the discretion exercised by the board of directors of the taxpayer. The Court does not wish to substitute its judgment for that of the taxpayer's board of directors, but in this case feels that the amount of compensation paid to Bernard A. Dahlem for the fiscal year ending March 31, 1960 was so disproportionate to that paid to him for the same services in other years as to be unreasonable. The Court accordingly reduces the total compensation for that year from $45,274 to $32,000. The Court finds that the total compensation of $15,869 received by Bernard A.

Dahlem for the fiscal year ending March 31, 1961 did not exceed the fair and reasonable value of his services for that year. Loesch & Green Const. Co. v. Commissioner, (6 Cir.; 1954), 211 F.2d 210, reversing § 52,351 P-H Memo TC; Golden Const. Co. v. Commissioner (10 Cir.; 1955), 228 F.2d 637, affirming § 54,327 P-H Memo TC; Toledo Grain & Milling Co. (6 Cir.; 1932) 62 F.2d 171, reversing § 31,006 P-H Memo BTZ.