A. T. WILLIAMS OIL COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
A. T. Williams Oil Co. v. Commissioner
Docket No. 1143-78.
United States Tax Court
T.C. Memo 1981-461; 1981 Tax Ct. Memo LEXIS 279; 42 T.C.M. (CCH) 851; T.C.M. (RIA) 81461; August 26, 1981. *279 Held, petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders. Leon L. Rice, Jr. and Thomas L. Kummer, for the petitioner. Frank D. Armstrong, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined an accumulated earnings tax pursuant to section 531[1] of $ 153,462.38 for petitioner's taxable year ended September 30, 1974. The sole issue for our decision is whether petitioner was availed of during that year for the purpose of avoiding the income tax with respect to its shareholders. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioner A.T. Williams Oil Company (sometimes referred to herein as Wilco) was incorporated on August 5, 1963. Petitioner's principal place of business is Winston-Salem, North Carolina. Petitioner filed its Federal income tax return for its taxable year ended September 30, 1974 [2] using the accrual method of accounting. *280 [3]
Petitioner was incorporated for the purpose of engaging in the retail sale of gasoline and the wholesale sale of kerosene and fuel oil (distillates). Petitioner was founded by A. T. Williams, Jr., who had been employed since 1957 by another oil company to supervise the operation of several service stations. During 1974 Williams and his wife, Elizabeth T. Williams, owned all of the 3000 outstanding shares of Wilco's stock. [4] During 1974 Wilco's corporate officers were Williams (President and Treasurer), Mrs. Williams (Vice-President) and H. Frank Stillman (Secretary) and Wilco's board of directors was composed of Williams, Mrs. Williams, Stillman, and Harold L. Wall. Williams is the dominant force behind Wilco and *281 generally makes the major decisions involved in Wilco's operations. During 1974 Wilco employed approximately 200 people: 50 service station managers, 12 to 14 truck drivers, and the remainder consisting of mechanics, maintenance people, service station supervisors, and office personnel. For the calendar year 1974 any ordinary income of A. T. Williams, Jr. and Elizabeth T. Williams in addition to the income shown on their joint Federal income tax return would be subject to tax at no less than a 70 percent rate. GASOLINE RETAILING Wilco is an independent, or "unbranded", [5] gasoline dealer. Wilco's gasoline retailing operation commenced in *282 October 1963 with the acquisition of eight service stations from another independent dealer. Wilco's gasoline business grew by gradually adding new service stations and improving others. By the end of 1972, Wilco operated some 50 service stations in North Carolina and Virginia under the trade name "Wilco." Wilco's expansion policy was primarily based on self-financing through the reinvestment of its profits rather than through borrowed funds. Several of Wilco's service stations were leased from third parties, including members of the Williams family. Sales at Wilco service stations account for approximately 65 percent of petitioner's sales and 80 percent of petitioner's net income. The essence of Wilco's service station operation is the utilization of high-volume and low-overhead marketing techniques which allow Wilco to price gasoline lower than branded service stations. Wilco service stations traditionally employed "self-service" marketing, *283 in which the customers, rather than service station employees, service their own automobiles and then pay an attendant for their purchases. Wilco focused on the sale of gasoline and, unlike branded marketers, never engaged in servicing automobiles nor the sale of tires and other accessories. Prior to 1972 Wilco was able to obtain all of its gasoline requirements from the refineries of major oil companies. Refiners generally desired to operate refineries at full capacity, which produced more gasoline than the branded marketers could sell. Because of this glut of gasoline supply, unbranded marketers, including Wilco, were sold gasoline at prices lower than branded marketers were required to pay. Another result of the abundance of gasoline was Wilco's ability to meet its requirements with minimal dependence on contracts with suppliers. The gasoline supply situation in North Carolina began to deteriorate in 1971, when Atlantic Richfield and British Petroleum announced their withdrawals from the market. The withdrawal of Atlantic Richfield and British Petroleum from North Carolina gave rise to rumors of possible withdrawals of other major suppliers from North Carolina. [6] *284 Wilco's principal suppliers of gasoline during 1972 through 1975 were Amerada Hess Corporation, Tenneco Oil Company, Kenco Petroleum Marketers, Houston Oil Company and American Petrofina Company. Tenneco Oil was Wilco's largest single supplier during this period. In August 1972 Tenneco notified Wilco that Tenneco was having difficulty meeting customers' demands and requested Wilco to purchase as much of Wilco's requirements as possible from other sources. Wilco therefore started to look for other suppliers. Although Wilco was unsuccessful on several attempts to procure additional gasoline Wilco was able to establish a relationship with Houston Oil. Houston Oil entered the North Carolina market in 1972 and began to sell gasoline to Wilco in October 1972. Houston Oil chose Wilco as a customer based on Wilco's reputation to be able to sell a product and promptly pay for it. Prior to 1973 the prevalent *285 credit requirements of suppliers were fairly undemanding. Most suppliers granted a 1 percent discount if purchases were paid for within 10 days of delivery and many suppliers allowed purchases to be made on a 30 day, or longer, open account. In the early part of 1973 however, Tenneco, which had previously extended to Wilco the 1 percent discount, required payment to be made within 10 days with no discount. Many suppliers required payment to be made upon delivery at the terminal. In May 1973 Houston Oil required Wilco to furnish a letter of credit for $ 111,000 to guarantee payment for Wilco's purchases through September 30, 1973. On May 6, 1974, Williams and Mrs. Williams executed a personal guarantee for Wilco's purchases of petroleum from American Petrofina. In October 1973 the Arab Oil Embargo of the United States began. When suppliers no longer had a surplus of oil to be refined independent marketers like Wilco were no longer assured of their supply and were required to pay the same price as branded marketers for whatever supply could be obtained. [7] *286 In October 1973 the Mandatory Petroleum Allocation Program was instituted for distillates. On December 27, 1973 the allocation program was extended to gasoline. Under the Mandatory Petroleum Allocation Program *287 suppliers were generally required to allocate available supplies to customers based on the customers' calendar year 1972 purchases. [8] Because Wilco had sought out other sources pursuant to Tenneco's request, Tenneco agreed to treat the gallonage Wilco purchased from other suppliers as if purchased from Tenneco for the purpose of computing Wilco's 1972 allocation base. Houston Oil and Tenneco both assured Williams that Wilco was a valued customer and would continue to be supplied petroleum by those companies if possible. Both Houston Oil and Tenneco relied on Wilco's financial status and Tenneco communicated to Williams the reasons for its confidence in Wilco. In March 1973 the Oil Import Appeals Board (OIAB) of the United States Department of the Interior granted Wilco a license to import 146,000 barrels [9] of foreign gasoline. Wilco, with the aid of Tenneco, was able to purchase approximately 31,000 barrels of foreign gasoline, which was significantly costlier than domestic gasoline. Wilco paid about $ 215,000 (exclusive of taxes) for this foreign *288 gasoline, payment of which was required before delivery. Wilco's suppliers of gasoline, gallons supplied and delivered price per gallon (rounded to the nearest cent) for 1971 through 1974 were as follows: Delivered Price Per
Gallon (Nearest Cent)
Year
Supplier
Gallons
Prem.
No Lead
Reg.
1971
Amerada Hess Corp.
6,834,210
.16
.13
Tenneco Oil Co.
18,599,350
.14
.13
Ashland Oil Co.
858,710
.14
.13
Kenco Petroleum
Marketers
1,417,153
.14
.12
27,709,423
1972
Amerada Hess Corp.
7,571,171
.16
.13
Tenneco Oil Co.
19,344,717
.14
.13
Ashland Oil Co.
90,879
.14
.12
Kenco Petroleum
Marketers
6,943,225
.14
.12
B.P. Oil Co.
116,932
.15
.13
34,066,924
1973
Amerada Hess Corp.
7,720,560
.17
.15
Tenneco Oil Co.
21,444,388
.16
.15
Kenco Petroleum
Marketers
9,353,964
.15
.13
Houston Oil Co.
4,075,153
.17
.15
B.P. Oil Co.
850,194
.15
.13
Reavis Oil Co.
9,600
.19
Johnson Oil Co.
18,629
.22
.19
Imported
1,306,578
.23
44,779,066
1974
Amerada Hess Corp.
8,566,548
.32
.32
.29
Ashland Oil Co.
122,937
.33
.21
American Petrofina
Co.
463,064
.34
.32
.31
Houston Oil Co.
3,800,390
.30
.27
Kenco Petroleum
Marketers
9,353,584
.26
.27
.24
Tenneco Oil Co.
22,279,843
.28
.32
.27
Beroth Oil Co.
132,678
.31
Little Oil Co.
108,700
.36
.34
Stallings Oil Co.
756,837
.34
.32
Etna Oil Co.
100,126
.28
.26
Bruner Oil Co.
22,700
.32
.30
Ethridge Oil Co.
78,120
.36
.34
McLean Co.
51,372
.22
Petroleum Distr.
147,155
.36
.33
45,984,054
*289 Wilco's gross sales of gasoline for 1971 through 1974 were as follows: Year
Gallons
Dollars
1971
27,448,620
$ 8,991,046
1972
33,988,997
11,215,620
1973
44,076,799
16,042,279
1974
46,045,576
23,541,944
In response to the supply shortfall Wilco changed several of its policies, such as eliminating self-service in several stations, reducing the sales commission self-service (for high-volume service stations), curtailing service station hours and allocating on a daily basis the gasoline sales of each service station. Wilco was also required to conform to a system of sales, based on automobile license plate numbers, imposed by North Carolina and Virginia. [10]
In March 1974 the available supplies of petroleum began to increase and as a result Wilco was able to eliminate some of the measures employed during the shortage. During 1974 Wilco charged the ceiling price allowed for gasoline under the "Phase IV" regulations promulgated by the Federal government's Cost of Living Council. Wilco gasoline was frequently *290 higher priced than competitors' gasoline. [11] In a letter dated April 18, 1973, to all gasoline customers, Williams stated: Effective at the opening of business Monday, April 23, 1973, the price of REGULAR GASOLINE will increase one cent (1") per gallon, and PREMIUM GASOLINE will increase one and one-half cent (1 1/2") per gallon. This increase was passed on to us Monday, April 16, 1973 by our suppliers. In its petition for gasoline allocation to the Oil Import Appeals Board (OIAB) for the allocation period January 1, 1974 through April 30, 1975, petitioner stated: In theory, under the petroleum price regulations, [Wilco] is able to pass through the higher costs of foreign product. [fn. deleted] In practice, because of competition in the marketplace, [Wilco] is unable to pass through all of the increased costs of foreign gasoline. While numerous service stations *291 failed during the oil shortage of 1973-1974, Wilco's policies succeeded in keeping most Wilco service stations open and greatly improved its customers' good will. DISTILLATE WHOLESALING Petitioner is also engaged in the purchasing, storing and wholesale selling of fuel oil and kerosene (distillates). Petitioner's distillate operations account for approximately 35 percent of petitioner's sales and 20 percent of petitioner's net income. Petitioner's sales of distillates are made from bulk plants, with limited storage capacity, located at four Wilco service stations. [12] Wholesale distillate sales are made to retailers for ultimate use in home heating and industry. Prior to 1967 or 1968, Wilco purchased distillates from the Gulf Coast area through the Riverside Terminal Company (RTC) of Greensboro, North Carolina. RTC purchased distillates for a group of marketers, including Wilco, and stored the distillates at its Greensboro facility after receipt through the pipeline from the Gulf Coast. Wilco traditionally purchased distillates *292 during the summer and stored the purchases at RTC until the winter, when the distillates were delivered to Wilco's bulk plants for sale to customers.Wilco's profit from distillates was derived from purchase at lower summer prices and sale at higher winter prices. This policy necessitated maintenance of a storage capability by Wilco. In 1967 or 1968, RTC sold the Greensboro terminal to Amerada Hess. On December 1, 1967, Hess granted Wilco (and RTC's other customers) a distillate storage contract which enabled Wilco to continue its pattern of summer purchase, storage and winter sale. Effective April 30, 1973 Hess terminated the Distillate Storage Contract with Wilco. On March 21, 1969 Hess and Wilco executed a Distillate Supply Contract, which was terminated by Hess as of May 31, 1973. Because of the importance of storage facilities to Wilco's distillate operation and because of the possibility that Wilco may need to make bulk purchases of gasoline, in March 1976 Wilco acquired a 100,000 barrel storage tank at the Triad Terminal in Greensboro, North Carolina at a total cost of $ 400,000. The oil embargo also created a shortage in the available distillate supply. Generally the *293 embargo had similar effects on Wilco's distillate operation as on Wilco's gasoline operation. The Mandatory Petroleum Allocation Program created in 1973 required an allocation of distillates based on sales for the entire 1972 calendar year. Wilco's purchases of kerosene and fuel oil, in gallons, for the calendar years 1972 through 1975 were as follows: Kerosene
Fuel Oil
Year
Supplier
Gallons
Gallons
1972
Hess
287,480
727,959
Tenneco
690,589
838,871
Kenco
1,850,733
3,264,893
Ashland Petroleum
2,300
0
2,831,102
4,831,723
1973
Hess
1,297,409
2,451,855
Tenneco
707,023
1,769,702
Kenco
1,173,231
2,433,728
3,177,663
6,655,285
1974
Hess
2,236,392
2,953,204
Tenneco
748,328
1,714,099
Kenco
1,413,255
3,698,886
4,397,975
8,366,189
1975
Hess
629,598
1,087,058
Tenneco
624,165
1,762,467
Kenco
1,604,583
3,285,794
American Petrofina
802,252
1,264,939
3,660,598
7,400,258
During the embargo Wilco's cost of distillates also rose. Wilco's sales price for distillates were based on the Phase IV ceiling prices rather than the prices of Wilco's competitors. On January 10, 1973, Williams sent a letter to all of Wilco's distillate customers which included the following: We are purchasing oil wherever it may be found regardless of price in order to have oil for you. *294 With the additional expense it becomes necessary to increase the price of KEROSENE effective Monday, January 15, 1973 $ .0030 (3/10) cent per gallon. There is no increase in fuel oil at this time. Wilco's letter of February 9, 1973 to its distillate customers stated: We have been able to do this [supply more than customers' December 1972 and January 1973 quotas] by buying from anyone that product could be purchased from regardless of price and as a result we must increase the price on kerosene and fuel oil $ .0040 (4/10") per gallon, effective Monday morning, February 12, 1973. The Gulf Coast price of kerosene and fuel oil increased 3/4 cent per gallon the early part of this week and as a result our supplying companies increased accordingly. We apologize for the further increase, but must pass this on when it is passed to us. In a letter dated January 4, 1974 to Wilco's fuel oil resellers, Williams stated, after reviewing distillate prices of competitors: We realize that there have been many price changes during the past few months, but this is something we cannot do anything about. We are passing on to you what is being passed on to us. As to what your competitor is charging, *295 I think each of us must forget what his price is and charge the allowable price for your product. Every competitor has only so many allotted gallons to sell each month, and there is no way he can take very much of your business. I wish to restate again that we are exerting every effort possible to keep oil to each of you, and that we are not charging you excessively, only what we are allowed to charge based on our cost. VAPOR RECOVERY Prior to 1974 the Environmental Protection Agency (EPA) enacted regulations which required any commercial, industrial or municipal account with gasoline storage exceeding 250 gallons to install vapor recovery equipment. These regulations were known as "Stage 1" vapor recovery and were intended to minimize air pollution from organic compounds contained in gasoline vapors. EPA also promulgated regulations for vapor recovery that applied to any person transferring gasoline from gasoline dispensing systems to an automobile fuel tank. These regulations were known as "Stage 2" vapor recovery. Several different systems have been designed for State 2. One system is the "vapor displacement" or "balance system," which captures gasoline vapors by attaching *296 a special vapor return hose through or outside the nozzle of a gasoline dispenser. The vapor return hose is installed through the inside of the gasoline dispenser and connected to the service station's gasoline storage facility. Estimates of the per service station costs of the vapor displacement system, as of October 1974, were $ 3,000 capital investment and $ 30 annul maintenance. The vapor recovery system initially favored by EPA was the "vacuum-assist" or "blower-assist" system. Like all vapor recovery systems, the vacuum-assist system also requires a special vapor return hose to be attached to the gasoline dispenser nozzle. A vacuum is utilized to capture gasoline vapors and move the vapors into storage. More sophisticated vacuum-assist systems may include a compressor a refrigeration unit, as well as a compressor. The estimated per service station costs of a vacuum-assist refrigeration-compression system, as of October 1974, were $ 9,000 capital investment, $ 210 annual maintenance and 37.3 kilowatt hours of electricity per day. [13] *297 EPA initially favored requiring vacuum-assist systems for purposes of efficiency. The oil industry, on the other hand, contended that the vapor displacement system was just as efficient as and less dangerous [14] than vacuum-assist systems. As of September 30, 1974 EPA did not require Stage 2 vapor recovery in either North Carolina or Virginia, nor did either state require Stage 2 vapor recovery. Stage 2 had been mandated in some California Counties prior to that time. At the time of the trial of the instant case (March 1979), Stage 2 was required in Buncombe and Mecklenburg Counties, North Carolina. As of September 30, 1974, Wilco had not established a reserve account for vapor recovery installation on its books, nor did Wilco have any written plans for the implementation of Stage 2. *298 The special vapor return hose was installed at some new service stations constructed by Wilco since 1976, but was not installed in existing service stations at the end of the year in issue. Williams had considered the possibility that Stage 2 may be required in Wilco's marketing area but would not install Stage 2 equipment unless required to. COMPETITION WITH BRANDED MARKETERS Prior to the oil shortage Wilco was able to purchase its supply from major oil companies at prices below those paid by branded marketers. One consequence of the shortage was Wilco's loss of this discount supply of surplus gasoline. Wilco's gasoline profits were based on self-service marketing which, combined with the lower cost of Wilco's supply, ketp Wilco's overhead relatively small. Before approximately 1972 branded marketers did not utilize self-service marketing. At that time branded marketers also began to provide self-service areas as well as the traditional full-service areas. Some branded marketers also sold self-service gasoline through service stations which used seemingly unbranded trade names. As of September 30, 1974, self-service marketing was being used by Wilco, other unbranded service *299 stations and branded service stations. FINANCIAL CONDITION Petitioner leased several of its stations from members of the Williams family and others. During the calendar years 1973 and 1974 petitioner made rental payments to Elizabeth T. Williams, A. T. Williams, Jr., and A. T. Williams, Jr., Trustee as follows: 1973
1974
Elizabeth T. Williams
$ 63,606.15
$ 67,656.81
A. T. Williams, Jr.
84,978.64
89,860.45
A. T. Williams, Jr., Trustee
42,491.32
44,883.06
Rentals paid by petitioner to the Williams family were computed on a gallonage basis, petitioner paying 1 1/2 cents rent per gallon of gasoline sold by the service station. Petitioner paid rent to lessors other than the Williams family based on a flat monthly fee. Petitioner on several occasions loaned money to its lessors for improvements to be made to a Wilco service station. On April 20, 1972 and May 10, 1972, loans of $ 30,011.65 and $ 3,655.28, respectively, were made to Elizabeth T. Williams for the construction of a shoe store. The shoe store was located on property abutting a Wilco service station in Winston-Salem, North Carolina, also owned by Mrs. Williams. On June 26, 1972 petitioner was repaid the $ 33,666.93 by Mrs. Williams. *300 Petitioner paid a dividend of $ 102,000 in 1974. This was the first dividend ever paid by petitioner. In 1975 and 1976 petitioner paid dividends of $ 150,000 and $ 120,000, respectively.In November 1972 petitioner's certified public accountant suggested to Williams that a dividend be considered by petitioner's board of directors. Petitioner's current assets, cash surrender value of life insurance policies, current liabilities and net liquid assets (computed by including cash surrender value of life insurance policies) at the end of the years 1964 through 1976 were as follows: Cash
Net
Taxable
Current
Surrender
Current
Liquid
Year * *301 Assets
Value
Liabilities
Assets
1964
$ 90,926
$ 55,430
$ 35,496
1965
167,251
111,053
56,198
1966
204,227
165,636
38,591
1967
297,317
239,029
58,288
1968
391,120
329,083
62,038
1969
574,694
436,643
138,051
1970
740,134
481,410
258,724
1971
1,164,688
647,555
517,133
1972
1,354,859
$ 393
583,566
771,686
1973
2,441,902
11,560
880,430
1,573,032
1974
4,463,090
19,785
1,683,783
2,799,092
1975
5,107,813
26,915
1,532,178
3,602,550
1976
4,686,108
50,972
1,366,521
3,370,559
The Federal excise tax on gasoline sales in 1974 was 4 cents per gallon and was collected by Wilco's suppliers at the time of delivery. North Carolina imposed a 9 cent per gallon sales tax plus 1/4 cent per gallon inspection tax. Virginia imposed a 9 cent per gallon sales tax on gasoline. Both Virginia and North Carolina required the taxes to be paid within 15 days after the end of each calendar month in which the gasoline was sold. Petitioner had month-end trade accounts receivable, inventory and accounts payable (including fuel taxes) during 1974 and 1975 as follows: Accounts
Payable
Accounts
(including fuel
Month
Receivable
Inventory
taxes)
October, 1973
$ 133,134
$ 446,087
$ 570,836
November
152,375
500,825
545,034
December
211,104
452,828
609,142
January
196,707
494,435
649,561
February
285,320
416,207
599,777
March
170,539
496,574
681,295
April
136,332
789,291
687,438
May
150,155
751,578
737,925
June
164,898
590,336
685,347
July
183,498
701,088
727,771
August
228,691
607,664
812,101
September
260,236
548,541
721,358
October, 1974
190,148
925,324
468,207
November
291,397
777,693
483,611
December
486,895
1,037,578
519,251
January
573,356
947,942
471,762
February
416,256
1,327,419
461,113
March
382,251
842,350
510,621
April
387,817
861,894
428,331
May
393,774
798,878
628,470
June
451,289
963,481
444,511
July
541,540
1,017,605
429,378
August
832,219
838,075
742,294
September
558,207
948,825
762,080
*302 Petitioner's cash on hand, cash in banks, certificates of deposit (maturing in less than 1 year) and annual interest income as of the end of each of the years 1964 through 1976 were as follows: Taxable
Year
Cash on Hand
Cash in Banks
Bank CD's
Interest Income
1964
$ 225
$ 21,403
1965
350
27,066
1966
450
19,563
1967
530
89,662
1968
555
66,209
1969
604
175,580
1970
766
244,661
1971
941
511,884
1972
1,104
705,389
$ 260
1973
1,179
543,925
$ 1,350,000
53,363
1974
1,154
562,293
3,150,000
199,493
1975
1,229
49,522
3,850,000
253,420
1976
1,254
434,880
2,250,000
196,930
Petitioner's sales, cost of goods sold, other operating costs (excluding depreciation and Federal income taxes) and taxable income for the years 1964 through 1976 were as follows: Federal
Taxable
Cost of
Operating
Taxable
Year *
Sales
Goods Sold
Expense
Income
1964
$ 1,084,366.05
$ 876,849.27
$ 187,105.19
$ 56,414.84
1965
1,611,889.31
1,301,929.88
241,760.76
87,507.40
1966
2,302,927.06
1,864,789.64
345,831.84
119,546.34
1967
3,220,472.25
2,607,020.95
477,216.13
185,886.02
1968
4,464,580.45
3,574,558.28
676,948.72
278,475.52
1969
5,985,792.07
4,713,386.10
936,261.86
433,608.01
1970
8,263,890.32
6,564,047.14
1,244,090.40
557,264.05
1971
10,695,724.91
8,320,703.39
1,571,038.95
935,811.61
1972
13,079,392.15
10,394,337.12
1,867,338.43
969,695.74
1973
18,381,960.60
[15] 14,800,092.14
2,432,497.90
1,452,473.13
1974
27,017,010.68
22,040,766.93
2,722,393.18
2,722,471.81
1975
36,353,489.58
31,527,319.58
3,061,223.74
2,383,690.35
1976
44,075,598.91
39,391,931.65
3,419,278.55
1,833,602.42
*303 Petitioner's retained earnings at the end of its taxable years 1964 through 1975 were as follows: Retained
Earnings at
Retained
Taxable
Beginning of
Earnings at
Year
Year
End of Year
1964
$ 40,668.12
1965
$ 40,668.12
95,114.45
1966
95,114.45
165,880.09
1967
165,880.09
274,382.23
1968
274,382.23
440,638.58
1969
440,638.59
656,663.80
1970
656,663.80
955,542.52
1971
955,542.52
1,285,114.65
1972
1,285,114.65
1,738,092.29
1973
1,738,092.29
2,497,242.88
1974
2,497,242.88
3,812,796.43
1975
3,812,796.43
4,917,187.53
Petitioner paid the following salaries to A. T. Williams, Jr. for its taxable years 1969 through 1976: Taxable Year
Salary
1969
$ 50,000.00
1970
60,000.00
1971
60,000.00
1972
70,000.00
1973
70,000.00
1974
[16] *304 110,000.00
1975
150,000.00
1976
165,000.00
Petitioner had reasonable needs of its business as of September 30, 1973 of at least $ 1,573,032. OPINION The issue for decision is whether petitioner is liable for the accumulated earnings tax, pursuant to section 531[17] *305 for its taxable year 1974. In order for the tax to be imposed we must decide whether petitioner is a corporation described in section 532, i.e., a corporation "availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." [18] *306 A corporation is subject to the accumulated earnings tax if one of its purposes for accumulating earnings is the avoidance of income tax with respect to its shareholders. The tax-avoidance purpose need not be the dominant or primary purpose for the accumulation for section 531 to apply. United States v. Donruss Co., 393 U.S. 297 (1969). Because the test set forth in section 532 is subjective Congress has aided our determination by providing in section 533(a) a presumption that the prohibited purpose existed if the corporation permitted its earnings and profits to accumulate beyond the reasonable needs of its business. This presumption must be overcome by a preponderance of the evidence. Determining the reasonable business needs of a corporation is a factual matter. Helvering v. NationalGrocery Co., 304 U.S. 282 (1938); Doug-Long, Inc. v. Commissioner, 72 T.C. 158 (1979). It is not the magnitude of the accumulation which is determinative, but whether the accumulation exceeds the corporation's reasonable business needs. *307 Smoot Sand & Gravel Corp. v. Commissioner, 274 F.2d 495, 500 (4th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 362 U.S. 976 (1960); Faber Cement BlockCo. v. Commissioner, 50 T.C. 317, 328 (1968). We should also be cognizant that the reasonable needs of a business are properly within the province of the officers and directors of the business. We are therefore hesitant to substitute our judgment for that of corporate management unless directed to do so by the facts and circumstances. Faber Cement Block Co. v. Commissioner, supra at 329; Bremerton SunPublishing Co. v. Commissioner, 44 T.C. 566, 583 (1965). Petitioner has availed itself of the procedure set forth in section 534[19] *308 and we have accordingly shifted the burden of proof to respondent regarding the following grounds for accumulation: amount required for working capital, and amounts required for anticipated installation of vapor recovery equipment, uncertainty of product supply and direct competition from major oil companies.[20]
One useful guideline in our determination of whether petitioner has unreasonably accumulated its earnings is to compare petitioner's net liquid assets with petitioner's reasonable business needs. Ivan Allen Co. v. United States, 422 U.S. 617, 628 (1975); Smoot Sand & Gravel Corp. v. Commissioner, supra, at 501; Faber Cement Block Co. v. Commissioner, supra, at 328. *309 Respondent computed petitioner's net liquid assets, as of September 30, 1974, to be $ 2,799,092. Petitioner computed its net liquid assets at that time to be $ 2,779,307. The difference of $ 19,785 lies in respondent's inclusion of the cash surrender value of certain life insurance policies owned by petitioner. [21]
We think that the cash surrender value of life insurance policies should not be conidered as a liquid asset. Life insurance policies with cash values represent possible sources for borrowed funds. Any borrowing obtained from a life insurance policy would be technically offset by a corresponding liability. In addition, many small businesses purchase "key man" life insurance to protect against the possible loss of revenue due to the death of a key employee or officer.In that situation the corporation would be unwilling to borrow against the policy. See Motor Fuel Carriers, Inc. v. Commisioner, 559 F.2d 1348, 1356 (5th Cir. 1977), *310 revg T.C. Memo. 1975-296. Although the record does not disclose whether the policies were on Williams, we hold that their cash surrender value should not be included in petitioner's liquid assets.[22]
OPERATING NEEDS One of the reasonable needs of a business is the retention of funds to provide for working capital. Section 1.537-2(b)(4), Income Tax Regs. The amount of working capital for one "operating cycle" is generally the amount included as a reasonable business need, Magic Mart Inc. v. Commissioner, 51 T.C. 775 (1969), although a corporation's working capital requirements may, depending on the facts, be computed on a shorter or longer basis than one operating cycle. Smoot Sand & Gravel Corp. v. Commissioner, supra.One operating cycle is the period of time required to convert cash into raw materials, raw materials into inventory, inventory into accounts receivable, and accounts receivable into cash. The length of the operating cycle is determined as a percentage of one year which is then multiplied by the total operating costs for one year. The product derived represents a roughhand approximation of the *311 business' working capital requirements.Doug-LongInc. v. Commisioner, supra; Magic Mart, Inc. v. Commissioner, supra; Faber Cement Block Co. v. Commissioner, supra.
Petitioner and respondent agree that the computation of petitioner's working capital needs should be guided by the formula developed in Bardahl Manufacturing Corp. v. Commissioner, T.C. Memo. 1965-200 and Bardahl InternationalCorp. v. Commissioner, T.C. Memo. 1966-182. However, the parties disagree on two aspects of the Bardahl formula: (1) whether petitioner's "credit cycle" should be considered, and (2) whether we should use petitioner's 1974 or 1975 operating costs. The Bardahl formula is not a rigid and immutable mathematical equation. In Smoot Sand & Gravel Corp. v. Commissioner, 241 F.2d 197, 207 (4th Cir. 1957), affg. in part a Memorandum Opinion of the Court, cert. denied 354 U.S. 922 (1957), the Fourth Circuit stated: Working capital needs of businesses vary, being dependent upon the nature of the business, its credit policies, the amount of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors. *312 Petitioner's computation of its working capital needs is as follows (all figures are for 1974 except where otherwise noted): 1. Cost of Goods Sold
$ 22,217,478  2. Peak Inventory
789,280  3. Number of Inventory Turnovers
(Line 1./. line 2)
28.1     4. Inventory Cycle in Days (365./. Line 3)
12.9575  5. Net Sales
27,017,010  6. Peak Accounts Receivable
136,322  7. Number of Accounts Receivable Turnovers
(Line 5./. line 6)
198.1     8. Accounts Receivable Cycle in Days (365./.
line 7)
1.825   9. Total Operating Cycle in Days (line 4 +
line 8)
14.7825 10. Operating Cycle as Percentage of
Year
(line 9./. 365)
4.05%
11. 1975 Cost of Goods Sold
31,527,320 12. Other 1975 Operating Expenses less
Depreciation
3,058,795 13. Total 1975 Operating Expenses (line 11
+ line 12)
34,586,115 14. Operating Expenses for One Business
Cycle (line 10 X line 13)
1,400,738  Respondent, in the statutory notice of deficiency, computed petitioner's operating cycle to also be 4.05 percent of one year. However respondent multiplied 4.05 percent by petitioner's total 1974 operating costs (less depreciation) of $ 24,763,159. Respondent thus determined petitioner's working capital requirements to be $ 1,002,907. On brief, *313 respondent contends that petitioner's operating cycle should be reduced by the following credit cycle: 1. Materials Purchased
$ 22,040,767  2. Average Monthly Trade Payalbe
669,132  3. Number of Trade Payable Turnovers
(line 1./. line 3)
32.9
4. Credit cycle in days (365./. line 3)
11.1
Respondent thus maintains that petitioner's total operating cycle is 3.7 days (14.8 less 11.1), or 1 percent of one year (3.7./. 365). Respondent concludes that inclusion of petitioner's credit cycle would render moot the issue of whether we should use petitioner's 1974 or 1975 operating costs. [23] Petitioner asserts that we should not consider a credit cycle for three reasons. First, petitioner points out that respondent did not raise the matter of credit extended to petitioner until brief and thus has introduced a new issue. Second, petitioner argues that respondent has attempted *314 to vary the stipulation. Third, petitioner asserts that respondent has failed to meet his burden of proof for establishing a credit cycle. Petitioner contends that new issues raised for the first time on brief, whether on opening brief or reply brief, should not be considered, citing Palmer v. Commissioner, 62 T.C. 684, 698 (1974), affd. 523 F.2d 1308 (8th Cir. 1975); Estate of Sparling v. Commissioner, 60 T.C. 330, 350 (1973), revd. on other grounds 552 F.2d 1340 (9th Cir. 1977); Maxcy v. Commissioner, 59 T.C. 716, 728 (1973); Kate Froman Trust v. Commissioner, 58 T.C. 512, 519 (1972). We do not agree with petitioner. In Palmer v. Commissioner, supra, petitioners, on reply brief, requested an increased valuation of certain donated stock. The valuation increase raised on reply brief was rejected because respondent had no notice of petitioner's claim and was thereby deprived of the opportunity to present objection to it. We also decided that the petitioners failed to carry their burden of showing an increased valuation, 62 T.C. at 699. The Eight Circuit affirmed our decision on this latter basis. Estate of Sparling v. Commissioner, supra, also involved an issue raised on reply *315 brief, i.e., whether the individual income tax returns of the decedent for years not before the Court should be reopened. The issue raised on original brief in Maxcy v. Commissioner, supra, involved the issue of whether the principal purpose of tax evasion or avoidance existed.Potential factual elements would have arisen which may have given an entirely different posture to the case including the possibility that the case would not have been fully stipulated. Because Maxcy was fully stipulated, respondent had no notice and opportunity to present evidence contrary to the issue raised on brief. In Kate Froman Trust v. Commissioner, supra, the petitioners suggested that a different method of computing the value of a charitable remainder be used and claimed that they were entitled to an overpayment.We rejected the petitioners' claim because the parties had stipulated that one method of computation was proper.Notice of the method suggested by petitioners on brief was never given to respondent and thus respondent could not object to it. All the cases cited by petitioner concern matters which, if considered by the Court, would have unduly prejudiced the nonrequesting party through surprise *316 and inability to present contrary evidence and objections. Unlike Palmer v. Commissioner, supra, the instant case does not involve a finding not requested at trial or brife; respondent does not seek to decrease petitioner's working capital requirements below the amount stipulated. Estate of Sparling involved years not before the Court. Maxcy was a fully stipulated case and thus the unfairness of the request was readily apparent. Similarly, Kate Froman Trust involved a request for an entirely different method of computing value then the method stipulated to by the parties. Here, respondent does not disavow the Bardahl formula, respondent only seeks consideration of a refinement to the formula. We do not think that petitioner will be unfairly surprised by our consideration of credit extended to petitioner. Petitioner stipulated to its month-end trade payables for 1974 and 1975. Additionally, respondent's cross examination of several witnesses concerned petitioner's credit terms from suppliers and petitioner's payment of State fuel taxes. Petitioner also introduced exhibits from suppliers concerning credit policies. Based on the record and the absence of a request by respondent *317 that we reduce petitioner's working capital needs below the stipulated amount, we hold that we may properly consider petitioner's trade payables. [24] Petitioner's second contention is without merit. Respondent clearly did not seek to vary the stipulation when he requested consideration of petitioner's credit cycle. Respondent's request for inclusion of the credit cycle is merely intended to buttress his contention that only $ 1,002,907 was required for petitioner's next operating cycle. Additionally, although not requested herein by respondent, Rule 91(e), Tax Court Rules of Practice and Procedure, allows the Court to qualify, change, or contradict a stipulation in whole or in part where justice requires. Petitioner's *318 last argument for rejection of a credit cycle has some merit. Petitioner relies on Central Motor Co. v. United States, 583 F.2d 470 (10th Cir. 1978) to argue that respondent has not introduced sufficient evidence to show the existence and length of a credit cycle. In Central Motor Co., the Commissioner determined that the accumulated earnings tax was applicable to each of four separate corporations, commonly owned by one individual. One corporation, Central Motor Co. (CMC), bought ad sold new and used automobiles. The parties agreed at the refund suit to use the Bardahl formula. However, the trial court instructed the jury that it might consider extensions of credit to CMC. This instruction was based solely on testimony that CMC's general supplies were paid on a 30-day basis and that new auto suppliers were paid cash. Inclusion of a 30-day credit cycle would have reduced CMC's operating cycle from 40.15 days to 10.15 days. The Tenth Circuit, reversing the District Court, held that a 75 percent reduction of CMC's operating cycle was improper without a more complete record of the effect of credit upon CMC's operations. Petitioner's average monthly account payable during 1974 was *319 $ 669,132. Respondent's inclusion of an 11.1 day credit cycle reduced petitioner's operating cycle from 14.8 days to 3.7 days, a 75 percent reduction. Petitioner argues that this drastic reduction in its operating cycle is unauthorized in light of Central Motor Co. The underlying rationale for consideration of the credit extended to a business is that such credit frees liquid assets that may not be otherwise useable by that business. This Court and other courts have frequently considered the impact of credit in this context.Smoot Sand &Gravel Corp. v. Commissioner, supra; Apollo Industries Inc. v.Commissioner, 358 F.2d 867 (1st Cir. 1966); C.E. Hooper, Inc. v. United States, 210 Ct. Cl. 615, 539 F.2d 1276 (1976); CataphoteCorp. v. United States, 210 Ct. Cl. 125, 535 F.2d 1225 (1976); Doug-Long v. Commissioner, supra; Atlas Tool Co. v. Commissioner, 70 T.C. 86 (1978), affd. 614 F.2d 860 (3rd Cir. 1980). [25] *320 The record herein discloses that petitioner was required to pay Tenneco, its major supplier, within 10 days of delivery. Order suppliers required 10 day or immediate payment. Petitioner's month-end trade payables reflect, in part, payables to suppliers which may have been due anywhere from one to ten days after the close of the month. Because petitioner's good reputation for prompt payment was partially responsible for petitioner's ability to obtain petroleum during the shortage, because the recod is at best sketchy with respect to the payables due to petitioner's suppliers and because respondent bears the burden of proof on the issue of petitioner's working capital requirements, we cannot agree with respondent that petitioner's credit, at least from suppliers, should be included in our determination. Petitioner's month-end payables also reflect Federal and State fuel taxes. The Federal fuel tax of 4 cents *321 per gallon, section 4081, [26] was payable to the supplier upon delivery and thus was not available to petitioner to meet its operating costs. However, State fuel tax of 9 1/4 cents per gallon and 9 cents per gallon for North Carolina and Virginia, respectively, must be considered differently from the Federal tax. The State fuel taxes collected by petitioner were payable 15 days after the close of the month within which the fuel was sold. Petitioner therefore had the use of these funds for a minimum of 15 days and for as long as 45 days. For example, the State tax on a gallon of gasoline sold by petitioner anytime during January was not payable until February 15. We cannot ignore the impact that these funds had on petitioner's operating requirements. During 1974 petitioner sold 46,045,576 gallons of gasoline, or a monthly average of 3,837,131 gallons. Petitioner's average 1974 monthly State fuel taxes payable was thus approximately $ 345,342 (9 " X 3,837,131). We can thus approximate a State fuel *322 taxes payable cycle as follows: 1. Average Monthly State Fuel
Taxes Payable
$ 345,342  2. Cost of Goods Sold
22,040,766  3. Number of State Fuel
Taxes
Payable Turnovers (Line 2./.
Line 1)
63.8
4. State Fuel Taxes Payable Cycle
in Days (365./. line 3)
5.7 Petitioner's operating cycle is thus 9.0825 days (14.7825 less 5.7) which is approximately 2.5 percent of 1 year. Petitioner's working capital requirements, even using 1975 costs, [27] are $ 864,653 ($ 34,586,115 X 2.5%). In view of the parties stipulation that petitioner's working capital requirements were at least $ 1,002,907 we hold that amount to be a reasonable business need. VAPOR RECOVERY Respondent claims that as of September 30, *323 1974 the anticipated requirement of installation of Stage 2 vapor recovery equipment was not a reasonable business need of petitioner. Respondent argues that Stage 2 vapor recovery who no more than a remote possibility at that time and that petitioner had no specific, definite or feasible plans covering the installation of vapor recovery systems.
Section 537(a)(1) includes within the term "reasonable needs of the business" the reasonably anticipated needs of the business. According to section 1.537-1(b)(1), Income Tax Regs., two tests must be met for a corporation to justify an accumulation for reasonably anticipated future needs. There must be an indication that the future needs of the business require such accumulation and the corporation must have specific, definite and feasible plans for the use of such accumulation. We believe that the likelihood of Stage 2 vapor recovery being mandated in petitioner's marketing area was insufficient for an accumulation of earnings. As of September 30, 1974, Stage 2 vapor recovery had not been mandated in any part of North Carolina or Virginia. Williams did not plan to install vapor recovery until required to. Although petitioner did make *324 some minor installations in new service stations which could be used for vapor recovery systems (the vapor return hose), alterations were made in order to avoid major expenses if vapor recovery was ever mandated. This fact does not mean that vapor recovery was likely within a reasonable period of time, as is required by section 1.537-1(b)(1). Based on the record we hold that petitioner's plans for vapor recovery installation were too indefinite to justify an accumulation of earnings. See Doug-Long, Inc. v. Commissioner, supra at 174-175 (petitioner was not justified in accumulated $ 40,000 for installation of vapor recovery equipment). COMPETITION WITH BRANDED MARKETERS Respondent maintains that petitioner had no specific, definite and feasible plans to retain a specific amount to meet its competition. Respondent also maintains that, based on petitioner's prior success and the fact that more branded then unbranded service stations failed during the oil shortage, petitioner's fear of increased competition was unjustified. Petitioner, on the other hand, points out two factors for an expected increase in competition: (1) the loss of petitioner's discount gasoline supply, and (2) *325 the increased use of self-service marketing by branded marketers, under both branded and seemingly unbranded trade names.
Petitioner's lack of a blueprint to meet its competition is not a fatal defect in its right to accumulate for that reason. Petitioner is basically a one-man operation and need not conform to the formalities of a publicly held corporation. John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 469 (1965); Bremerton Sun Publishing Co. v. Commissioner, supra at 584-585; Doug-Long, Inc. v. Commissioner, supra at 171. The facts in the instant case demonstrate Williams' concern with maintaining petitioner's stance in the market place and a consistent course of conduct to achieve that goal. Nor does petitioner's failure to set aside a specific sum for this purpose prevent an accumulation. As we stated in John P. Scripps Newspapers v. Commissioner, supra at 469: "It is not always possible for a company in advance to set aside a specific sum to achieve a specific goal." We fail to grasp how a specific sum could be ascertained sufficient for this purpose by management. We also find that petitioner reasonably anticipated increasing competition in the oil industry. The *326 maintenance of a corporation's competitive position within its industry is a legitimate purpose for the accumulation of earnings. John P. Scripps Newspapers v. Commissioner, supra at 469-470; Bremerton Sun Publishing Co. v. Commissioner, supra at 585; Electric Regulator Corp. v. Commissioner, 40 T.C. 757, 767 (1963), revd. on other grounds 336 F.2d 339 (2nd Cir. 1964). Like other grounds for accumulation, this ground must be justified under the facts and circumstances. Respondent relies on the following language from Motor Fuel Carriers, Inc. v. United States, 202 F.Supp. 497, 500-501 (N.D. Fla. 1962), vacated and remanded on other grounds, 322 F.2d 576 (5th Cir. 1963), to argue that petitioner's fear of increased competition was unjustified: Although the corporation could not predict with sufficient certainty that its business would continue to increase and that its earnings would continue as it had in the past, the fear of competition and fear of lack of liquidity which are assigned as reasons for the accumulation must be reasonable under the circumstances. * * * Most business must meet competition with like type of businesses and must maintain inventory or rolling stock in sufficient *327 quantities to meet such competition, but fear of competition alone, particularly where its record of earnings in the past does not justify such fear, does not warrant accumulations of surplus in excess of that which is reasonable. Likewise, the reasonable businessman is constantly in a position where he might lose some sources of revenue from his existing customers. * * * The Court finds that in light of the taxpayer's past record of earnings throughout the whole history of the business, the fear or [sic] competition and the fear of losing lucrative contracts was unjustified and not reasonable under the circumstances. Clearly, the issue was decided on the record in that case and thus the cited language is not especially persuasive herein. While we recognize that competition is invariably a factor in any business, we still must decide whether the competitive circumstances within a particular industry justify an accumulation for a particular corporation. While petitioner's history displays a solid and sometimes even spectacular pattern of growth and profitability, petitioner's success does not preclude an accumulation to maintain its status. The early 1970's were difficult years *328 for independent dealers like petitioner and, while the situation eased somewhat in 1974, petitioner still remained in a highly competitive industry. Additionally, more direct competition came from the major oil companies during these years than before. The major companies began utilizing self-service marketing techniques and in some instances used self-service under apparently unconnected and independent brand names. Coupled with the loss of petitioner's discount source of product, petitioner was clearly reasonable in accumulating earnings to meet its competition. We find that petitioner could reasonably accumulate $ 80,000 for this purpose. UNCERTAINTY OF SUPPLY The final ground for accumulation, on which the burden of proof rests upon respondent, is the uncertainty of supply as of September 30, 1974. Respondent argues that petitioner was able to obtain all the petroleum required on the domestic market, due in part to the Mandatory Fuel Allocation Program, and thus did not need to accumulate earnings for any other purchases. Respondent, again, points to the lack of any specific, definite and feasible plan of petitioner to make additional fuel purchases. Petitioner asserts that *329 a chaotic situation existed at the time involved, particularly for independent dealers which lacked supply contracts. Petitioner also asserts that a strong financial position was required in order to preserve its existing sources of supply and possibly obtain new sources. Lastly, petitioner contends that it may have needed to make bulk purchases of petroleum on the "spot market" similar to petitioner's 1973 purchase of foreign gasoline.
As of September 30, 1974, the supply shortage had eased considerably. Petitioner's service stations were operating on their pre-shortage schedules and selling more gallons than ever before. While the allocation program would continue to assure a flow of petroleum to petitioner, any supply obtained above the allocated amounts was obtained largely through petitioner's strong financial position. Because petitioner's success depended in large part upon high-volume sales procuring additional petroleum was quite important. Any significant reduction in petitioner's financial status could well have impaired petitioner's ability to obtain additional product. However, this factor must be discounted somewhat because of its consideration within the previous *330 ground for accumulation. Petitioner had also petitioned the OIAB for a license to import 951,819 barrels of foreign gasoline for the period January 1, 1974 through April 30,1975. While the record does not disclose whether petitioner did in fact obtain this license, the respondent has the burden of proof on this issue and has not shown otherwise. There existed a reasonable possibility that the supply could again tighten in the near future and petitioner may thus resort to bulk purchases whenever available. Spot purchases required large amounts of cash (petitioner paid $ 215,000, exclusive of taxes, for the 1973 spot purchase). We therefore find that petitioner could justify an accumulation of $ 150,000 to cope with the uncertain supply situation. See Doug-Long, Inc. v. Commissioner, supra at 172-173; Dielectric Materials Co. v. Commissioner, 57 T.C. 587, 599 (1972). EXISTENCE OF PROSCRIBED PURPOSE We have found that petitioner's net liquid assets, as of September 30, 1974, were $ 2,779,307. We have also found petitioner's reasonable business needs, as of that date, to be $ 2,111,302. [28] Petitioner has thus allowed its earnings and profit to accumulate beyond its reasonable business *331 needs and, pursuant to section 533(a), unless petitioner shows by a preponderance of the evidence that petitioner was not availed of for the purpose of avoiding the tax on the shareholder level we must find for respondent. In Ivan Allen Co. v. United States, supra, the Court stated, 422 U.S. at 633: "If the corporation has freely available liquid assets in excess of its reasonable business needs, then accumulation of taxable income may be unreasonable and the [Sec. 531] tax may attach." Whether the section 531 tax does attach depends upon the presence of the proscribed purpose.
Petitioner, by posing the issue solely in terms of its reasonable business needs, has not met its burden. On reply brief petitioner argues, for the first time, that the test of whether the proscribed purpose existed is whether knowledge of the tax consequences of a distribution to shareholders contributed to the decision to accumulate earnings, citing United States v. Donruss, supra. *332 Petitioner then argues that reliance upon an independent public accountant and the extensive efforts taken by Williams to determine a proper dividend in light of business realities negate any inference that petitioner acted with the prohibited purpose.
Several factors must be weighed in determining the existence of the purpose described by section 532. The effect of a distribution upon shareholders is only one factor to be considered and is by no means determinative. Commissioner v. Young Motor Co., 316 F.2d 267, 272 (1st Cir. 1963), revg. 32 T.C. 1336 (1959); R. Gsell & Co. v. Commissioner, 294 F.2d 321, 327 (2nd Cir. 1961), revg. 34 T.C. 41 (1960). Williams, who owned 100 percent of petitioner by attribution, was notified of a possible accumulated earnings tax problem as early as 1972, although his knowledge of the consequences of a distribution by petitioner is not clear. Section 1.533-1(a)(2), Income Tax Regs., lists several factors other than an accumulation beyond reasonable business needs to be considered. This list is not exclusive and includes corporate-shareholder dealings for the shareholder's personal benefit, corporate investments unrelated to the corporate business *333 and the extent to which the corporation has distributed its earnings and profits. In light of the section 533(a) presumption an accumulation beyond the corporation's reasonable business needs is by far the most important factor. We have previously decided that petitioner's accumulation exceeded its reasonable business needs. Based on the presumption in section 533(a) and petitioner's failure to meet its burden, we hold that petitioner was availed of for the purpose proscribed by section 532 and is thus liable for the section 531 tax.
Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Petitioner reports on the basis of a fiscal year ending September 30. For purposes of convenience petitioner's taxable years will hereafter be referred to by the year (i.e., 1974). ↩
3. The parties have stipulated that petitioner's returns for 1964 through 1976 were filed with the Internal Revenue Service Center at either Atlanta, Georgia or Memphis, Tennessee. It is not discernable from petitioner's 1974 return where such return was filed nor whether it was timely filed.↩
4. Petitioner's stock was held as follows: ↩
Name
Number of Shares
A. T. Williams, Jr.
1,866
Elizabeth T. Williams
1,050
Elizabeth T. Williams, Custodian for
Arthur T. Williams, III
6
Elizabeth T. Williams, Custodian for
Susan E. Williams
6
Elizabeth T. Williams, Custodian for
Stephen T. Williams
6
Elizabeth T. Williams, Custodian for
Nancy E. Williams
6
A. T. Williams, Jr. Trustee for
Arthur T. Williams, III
15
A. T. Williams, Jr. Trustee for
Susan E. Williams
15
A. T. Williams, Jr. Trustee for
Stephen T. Williams
15
A. T. Williams, Jr. Trustee for
Nancy E. Williams
15
Total
3000
5. "Unbranded" dealers purchase their product from various sources and are not commonly associated with the various major oil companies. "Branded" dealers, on the other hand, are affiliated with the major oil companies which supply their product.↩
6. Atlantic Richfield and British Petroleum supplied approximately 6 percent of the gasoline in North Carolina. Although Wilco purchased no gasoline from either supplier in 1971, Wilco did purchase some gasoline from British Petroleum in 1972 and 1973, apparently for its Virginia service stations.
7. As a result of the shortfall, independent marketers began to seek new sources of petroleum. In late 1973 some 13 independent marketers, including Wilco, incorporated Petrolina, Inc. with the purpose of procuring additional supplies by either buying cargo lots of oil at the Gulf Coast or purchasing a refinery. Because purchasing cargo lots at the Gulf Coast would have required a pipeline to move the oil to North Carolina, Petrolina decided to purchase a small refinery. Petrolina entered into negotiations to purchase a refinery located in Baton Rouge, Louisiana owned by Torro Petroleum Company for approximately $ 21,000,000. The purchase price was to be financed by $ 11,000,000 in loans and $ 10,000,000 capital contributions of Petrolina's shareholders. On October 9, 1973, Wilco's board of directors approved a $ 50,000 purchase of Petrolina stock and recognized that Wilco's contributions to Petrolina might eventually be required to substantially exceed $ 50,000. However, before Petrolina could finance the purchase of the Torro refinery, the refinery was sold to another purchaser for $ 21,000,000.↩
8. Since Houston Oil did not sell to Wilco until October 1972, Wilco's allocation share from Houston Oil utilized 1973 as the base period.↩
9. One barrel of gasoline contains approximately 42 gallons.↩
10. One reason for Wilco's partial elimination of self-service was to ensure that customer's gasoline purchases did not exceed the maximum amounts allowed by state authorities under state rationing plans.↩
11. Because of this price differential, as of December 1, 1973, Wilco service stations no longer honored bank credit cards as payment for gasoline purchases. Eliminating bank credit cards resulted in a reduction of record-keeping for service station managers and a reduction in Wilco's overhead of approximately one cent per gallon.↩
12. Wilco's bulk plant locations, as of 1976, were in Winston-Salem, North Carolina (two locations), High Point, North Carolina and Durham, North Carolina.↩
13. The estimated per service station costs of a vacuum-assist compressor system, without a refrigeration unit, as of October 1974 were $ 6,200 capital investment, $ 125 annual maintenance and 9.3 kilowatt hours of electricity per day.
14. The oil industry's safety concern over vacuum-assist system centered on two points. First, the mixture of gasoline vapors and air employed by vacuum-assist systems was potentially explosive and flammable. Second, increased air pressure in gasoline storage tanks increased the risk of leakage from such tanks.↩
*. Although the parties have stipulated to certain amounts, several of the stipulated amounts are in error. Any erroneous figures have been corrected in this table.
*. Although the parties have stipulated to certain amounts, several of the stipulated amounts are in error. Any erroneous figures have been corrected in this table. ↩
15. On petitioner's return for its taxable year 1973 petitioner elected to convert from the First In First Out (FIFO) method of inventory valuation to the Last In First Out (LIFO) method. As a result of this change, petitioner's ending inventory for its taxable year 1974 was decreased and cost of goods increased by $ 29,296.19.↩
16. Williams' 1974 salary and bonus from petitioner were paid as follows: ↩
October 31, 1973
$ 1,500.00
November 30, 1973
1,500.00
December 31, 1973
1,500.00
January 31, 1974
32,486.46
January 31, 1974
2,237.10
February 28, 1974
1,500.00
March 31, 1974
1,500.00
April 30, 1974
1,500.00
May 31, 1974
1,500.00
June 30, 1974
1,500.00
July 31, 1974
1,500.00
August 31, 1974
25,000.00
September 30, 1974
1,500.00
September 30, 1974 (bonus)
35,276.44
$ 110,000.00
17. SEC. 531.IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of-- (1) 27 1/2 percent of the accumulated taxable income not in excess of $ 100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $ 100,000. ↩
18. Petitioner, at trial and on brief, has posed the issue as: "Whether petitioner permitted its earnings to accumulate beyond the reasonable needs of its business." While the question of whether a corporation's earnings have been accumulated beyond its reasonable business needs is quite relevant to a determination of the propriety of the section 531 tax, particularly when the section 533(a) presumption and section 535(c) credit are considered, section 531 becomes operative only when the ultimate determination is made that the corporation has been formed or availed of for the purpose proscribed by section 532. PeltonSteel Casting Co. v. Commissioner, 28 T.C. 153, 183-184 (1957), affd. 251 F.2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958); American Metal Products Corp. v. Commissioner, 34 T.C. 89, 99 (1960), affd. 287 F.2d 860 (8th Cir. 1961). Therefore while we have shifted the burden of proof to respondent regarding petitioner's reasonable business needs, pursuant to section 534↩, the burden of proof on the ultimate issue, the existence of the proscribed purpose, remains on petitioner.
19. Section 534(a) provides that, in part, in any proceeding before this Court involving a notice of deficiency based in whole or in part on the allegation that all or a portion of a corporation's earnings and profits have been accumulated beyond its reasonable business needs, the burden of proof with respect to such allegation shall be on the respondent if (1) respondent has failed to mail the notification described in section 534(b), or (2) respondent mailed the section 534(b) notice and petitioner submitted a statement, pursuant to section 534(c), setting forth the grounds (and underlying facts) for the accumulation. When section 534(c) has been satisfied, as here, the burden of proof shifts to respondent only for those grounds set forth in the petitioner's statement, section 534(a)(2)↩. 20. The parties have agreed that petitioner had reasonable business needs of $ 1,378,395 consisting of the acquisition of a storage facility ($ 400,000), improvements and equipment ($ 278,395) and new service stations ($ 700,000).↩
21. The parties have stipulated $ 19,785 as the cash surrender value of the policies. Petitioner's balance sheet included in its 1974 return states $ 39,957.83 as the value of the policies and certain prepaid expenses, without separately stating the value of each type of asset.↩
22. See Suwannee Lumber Manufacturing Co. v. Commissioner, T.C. Memo. 1979-477↩.
23. Respondent, on brief, submitted the following computations for petitioner's operating needs: 1% X $ 24,763,159 (1974 costs) = $ 247,632 1% X $ 34,586,115 (1975 costs) = $ 345,861 However, respondent stipulated that petitioner's working capital requirements were at least $ 1,002,907 and does not seek an increased deficiency.↩
24. We are not entirely satisfied that respondent's request constitutes a new issue. Evidence of credit terms and the trade payables of petitioner are in the record. Had respondent not formulated a "credit cycle" to be interjected into the Bardahl formula we would still be free to consider the credit extended to petitioner. Smoot Sand & Gravel Corp. v. Commissioner, 274 F.2d 495 (4th Cir. 1960), affg. a Memorandum Opinion of this Court, cert denied 362 U.S. 976↩ (1960).
25. See also Suwannee Lumber Manufacturing Co. v. Commissioner, T.C. Memo. 1979-477; Estate of Kriesel v. Commissioner, T.C. Memo. 1978-50; Marie's Shoppe Inc. v. Commissioner, T.C. Memo. 1977-381; Alma Piston Co. v. Commissioner, T.C. Memo. 1976-107, affd. 579 F.2d 1000 (6th Cir. 1978); W.L. Mead, Inc. v.Commissioner, T.C. Memo. 1975-215, affd. 551 F.2d 121 (6th Cir. 1977); Walton Mill, Inc. v. Commissioner, T.C. Memo. 1972-25; Kingsbury Investments, Inc. v. Commissioner, T.C. Memo. 1969-205; Bardahl International Corp. v. Commissioner, T.C. Memo. 1966-182↩.
26. SEC. 4081. IMPOSITION OF TAX. (a) In General.--There is hereby imposed on gasoline sold by the producer or importer thereof, or by any producer of gasoline, a tax of 4 cents a gallon.↩
27. While we need not decide whether petitioner's 1975 costs should be considered for our determination herein, we have recognized the effects of inflation within the Bardahl formula. See Suwannee Lumber Manufacturing Co. v. Commissioner, T.C. Memo. 1979-477; Empire Steel Castings, Inc. v. Commissioner, T.C. Memo. 1974-34; Delaware Trucking Co. v. Commissioner, T.C. Memo. 1973-29↩. The countervailing effect of petitioner's ability to pass on its increased costs to its customers also need not be considered.
28. Working Capital
$ 1,002,907
Storage Facility Agreed to by respondent as a reasonable business need.
*↩
400,000
Improvements & Equipment *
278,395
New Service Stations *
200,000
Competition with Majors
80,000
Uncertainty of Supply
150,000
$ 2,111,302