SOROS ASSOCIATES INTERNATIONAL, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Soros Associates International, Inc. v. Commissioner
Docket No. 2750-80.
United States Tax Court
T.C. Memo 1982-79; 1982 Tax Ct. Memo LEXIS 671; 43 T.C.M. (CCH) 566; T.C.M. (RIA) 82079; February 16, 1982. David W. Welles, for the petitioner. William M. Gross, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: This case is before us on petitioner's "Motion for Ruling on Burden of Proof with Respect to Retention of Earnings." The issue presented is whether petitioner's statement, submitted pursuant to section 534(c), [1] is sufficient to shift the burden of proof to respondent with respect to the grounds for accumulation set forth in that statement. [2]
*674 Petitioner is a Panamanian corporation with its principal place of business in New York, New York. On December 7, 1977, respondent, pursuant to section 534(b), notified petitioner that a proposed notice of deficiency for petitioner's taxable years 1974 and 1975 included "amount[s] with respect to the accumulated earnings tax imposed by section 531." On February 2, 1978, petitioner submitted to respondent a statement of grounds upon which petitioner relies to establish that its earnings and profits were accumulated during 1974 and 1975 for the reasonable needs of its business. It is the sufficiency of that statement which is in issue. Section 531 imposes a tax on corporations "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." Sec. 532(a). The general rule in this Court that the burden of proof is upon the taxpayer, Rule 142(a), [3] applies to deficiencies determined with respect to section 531. However, section 534 provides a limited exception *675 to that general rule. See also Rule 142(e). Section 534 provides, in pertinent part, as follows: (a) General Rule. -- In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall-- (1) if notification has not been sent in accordance with subsection (b), be on the Secretary, or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary.--Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency *676 includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer.--Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. Thus, a taxpayer's statement of grounds for accumulation may place upon the respondent the burden of proving that earnings and profits were accumulated beyond the reasonable needs of the business with respect to grounds delineated in that statement. [4]
*677 What constitutes a statement sufficient to place the burden of proof on respondent is not entirely clear, since each case has been decided on its own facts without delineation of any specific guidelines. See e.g. Herzog Miniature Lamp Works, Inc. v. Commissioner,481 F.2d 857 (2d Cir. 1973), affg. a Memorandum Opinion of this Court; Shaw-Walker Company v. Commissioner,390 F.2d 205 (6th Cir. 1968), remdg. on other grounds a Memorandum Opinion of this Court; Chatham Corporation v. Commissioner,48 T.C. 145 (1967); Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566 (1965); John P. Scripps Newspapers v. Commissioner,44 T.C. 453 (1965); Electric Regulator Corporation v. Commissioner,40 T.C. 757 (1963), revd. on other grounds 336 F.2d 339 (2d Cir. 1964). Section 534(c) only requires explicitly a statement of grounds for accumulation and "facts sufficient to show the basis thereof," and the regulations thereunder add no explicit requirements. See sec. 1.534-2, Income Tax Regs. *678 However, implicit in section 534(c) is the requirement that the paxpayer corporation's statement be specific rather than general or vague. Herzog Miniature Lamp Works, Inc. v. Commissioner,supra;Bremerton Sun Publishing Co. v. Commissioner,supra.[5] Thus, a line must be drawn between a statement which only alleges general grounds, such as competition or expansion, without giving any informative factual basis and a statement which outlines basic facts to support alleged grounds. It is the informative quality, not the *679 number, of the facts set forth in a section 534(c) statement which determines sufficiency. Respondent must be given a factual basis from which he can proceed to prepare his case. However, the taxpayer-corporation is not required to state facts sufficient to meet a burden of proof which it may never have. See Holzman, Why Taxmen Are Sore at "534," 39 Taxes 777 (1961). A delicate balance must be reached between those two competing factors. However, given the extensive discovery tools, both formal and informal, available to parties litigating in this Court, we find a section 534(c) statement, to be sufficient to shift the burden of proof as to any ground for accumulation asserted therein, [6] must outline only the basic facts necessary to notify respondent of the bases of the ground asserted. [7] With that in mind we turn to an evaluation of the statement before us. *680 In its section 534(c) statement, petitioner stated six grounds to justify its accumulation of earnings and profits during 1974 and 1975. As an opening matter in its statement, petitioner described itself as follows: Soros Associates International, Inc. ("SAII") is a Panamanian corporation that has traditionally been engaged in the design, engineering and development of large port facilities for the bulk handling of materials. SAII performs its services on a worldwide basis. SAII's engineering business is intensely competitive. SAII's principal competitors are four large multinational companies with sizeable assets. All of the stock of SAII is, and was during the years in controversy, owned by Paul Soros, residing at 1112 Oenoke Ridge, New Canaan, Connecticut. SAII, as a small, closely held corporation, operates in an informal manner. The organization had, during the years in controversy, a staff of about 55 people. Most of its internal business is conducted by oral discussions; Paul Soros, the sole shareholder and chief executive, does not ordinarily communicate with his personnel by memorandums. He rarely makes memorandums of meetings and discussions. The company *681 has no in-house legal counsel, and its corporate books and records are kept by its controller. Thus, respondent was provided a basic outline of petitioner's operation. As a first ground, petitioner states that it was reasonable to accumulate $ 1,155,006 and $ 1,589,595 during 1974 and 1975, respectively, for the working capital needs of its business. In arriving at those figures, petitioner used the average business cycle approach of Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200, with certain modifications to take into account the lack of inventories and certain professional services. Furthermore, petitioner attached to its statement detailed computation schedules concerning working capital needs. Petitioner's calculations reflect the combined needs of petitioner and Soros Associates. Soros Associates (Associates) is a partnership formed on January 1, 1974, and is the transferee of petitioner's engineering business. Associates was formed to allow key employees of petitioner to participate in profits. Each employee participated through his individually-owned corporation. When an employee withdraws or when Associates is dissolved, the *682 employee gets an accumulated profits share and nothing more. Petitioner has been the managing and controlling partner of Associates since Associates' inception. Petitioner has the right to dissolve Associates at any time. Respondent contends any accumulation by petitioner for Associates was not per se an accumulation for the reasonable needs of petitioner's business, and thus petitioner's statement is insufficient on this first ground for that reason. We disagree for the reasons below. In essence, respondent asks us to determine whether Associates' needs may be considered petitioner's needs as an integral part of our ruling on the section 534 burden of proof motion. This we refuse to do. As the Second Circuit Court of Appeals (to which an appeal herein would lie) said, respondent "seemingly has placed the proverbial cart before the horse." R. Gsell & Co. v. Commissioner,294 F.2d 321, 325 (2d Cir. 1961), revg. on other grounds 34 T.C. 41 (1960).Petitioner clearly "showed its hand" by relying on Associates' needs as well as its own, see R. Gsell & Co.,supra at 325, and has provided respondent specific facts and figures. To require *683 more, would be to require a taxpayer corporation to prove reasonable accumulation before it would be relieved of such a burden. [8]
Accordingly, the burden of proof shall be upon respondent as to whether it was reasonable for petitioner to accumulate $ 1,155,006 and $ 1,589,598 in 1974 and 1975, for *684 the working capital needs of its business. As a second ground, petitioner states it was reasonable to accumulate $ 1,808,270 and $ 1,330,164 during 1974 and 1975, respectively, to achieve "total project responsibility." Of those amounts, $ 1,308,270 (1974) and $ 830,164 (1975) relate to a project known as Cleancoal Terminals, while the remaining $ 500,000 in each year represents approximations for needs of other "total project responsibility" projects. Total project responsibility entails petitioner's development of "the capacity to handle port projects on a total 'package' basis" by being able "not only to engineer, but also to construct, finance, and operate port projects." Such development was necessary for petitioner to remain competitive. In 1972, petitioner's officers and a representative of Codell Construction Company (Codell) decided to organize a general partnership to construct, finance, and operate a terminal at Ghent, Ky., to transfer low sulfur coal from railroad cars to Ohio River barges. In 1971, the Louisville & Nashville Railroad (the railroad) urged various companies to construct a coal terminal on the Licking River, an Ohio River tributary, to handle expected *685 increased demands for low sulfur coal. In April 1972, one of petitioner's principal competitors contracted to engineer the Licking River terminal. However, the Licking River terminal was expected to handle no more than six million tons of coal per year, and the railroad urged petitioner and Codell to construct an additional terminal at Ghent. In late 1972, petitioner and Codell began discussions on how to structure their joint venture. William Kendall, chairman of a company controlling the railroad, was asked to join the venture. Codell and Kendall, wishing to limit their liability, wanted to participate through corporations with the corporations being limited partners. Petitioner decided to operate in the venture in the same manner, except petitioner used a sister corporation, Soros Bulk Systems, Inc., rather than a subsidiary corporation. In 1973, petitioner and Soros Bulk Systems, Inc., formed a limited partnership known as Soros and Romay Associates with Soros Bulk Systems, Inc., being the general partner and petitioner being the limited partner. [9] Petitioner contributed 90 percent of the capital and was allocated 90 percent of the profits and losses. *686 On November 1, 1973, Soros and Romay Associates and the corporations controlled by Codell and Kendall formed a Kentucky partnership known as Cleancoal Terminals (Cleancoal) to construct the Ghent terminal. Each partner contributed equal capital and participated equally in profits. Petitioner performed the engineering work for Cleancoal and took a very active role in its management. [10]
On June 28, 1974, Cleancoal entered into a contract with Kentucky Utilities obligating Cleancoal to handle 1,200,000 tons of coal per year for ten years beginning on September 1, 1976. To ease some concerns of Kentucky Utilities concerning completion of the terminal, Cleancoal promised reasonable proof of progress by August 31, 1974. Such proof, which was accepted by Kentucky Utilities, took the form of a progress report prepared by petitioner. By May 1974, petitioner had a written projection that the capital costs of the Ghent terminal would be $ 4,600,000. Petitioner's share of those costs alone would have been $ 1,380,000. After the contract *687 with Kentucky Utilities was executed, Cleancoal unsuccessfully sought long-term bank financing of approximately $ 4,200,000. An October 1974 detailed cash flow sheet, which was attached to petitioner's statement, indicated Cleancoal's cash needs with bank financing and with the Kentucky Utilities contract alone. Without bank financing, it was projected that Cleancoal would need $ 4,600,900 to carry it through 1977. Petitioner's share was $ 1,380,270 of which $ 72,000 was paid by the end of 1974. By the end of 1974, Cleancoal had begun ordering expensive bulk equipment. Usually the suppliers of that equipment relied on the reputations of petitioner and the other partners rather than taking guarantees. In 1975, the Environmental Protection Agency ruled that a dust collector would have to be installed at the terminal. [11] Such a collector costs about $ 400,000. In February 1975, Cleancoal was able to borrow $ 4,200,000 from a Kentucky bank to be repaid over nine years. Also in 1975, Cleancoal decided to use a professional agency for promotion at a cost of $ 90,000 per year and revised its former 4.6 million dollar cost estimate to 5.2 million. *688 Taking into account cost overruns, the dust collector, and the professional fees, the October 1974 cash flow sheet showed Cleancoal would need $ 3,010,548 over the 4.2 million financing to last through 1977. Petitioner's share was $ 903,164 of which only $ 73,000 had been contributed by the end of 1975. The facts recited above, while lengthy, are only a summary of petitioner's statement. As with the first ground, respondent only attacks whether a reasonable need of petitioner's business is described in this second ground. He does not challenge the specificity or clarity of that ground. Once again we decline to delve into that question in connection with the instant motion. Petitioner has outlined clearly its stance as to accumulations for Cleancoal. We find petitioner's statement sufficient to place upon respondent the burden of proof with respect to those accumulations. [12]
*689 As a third ground petitioner's statement lists $ 500,000 per year as the approximate amount which was reasonable to accumulate for the posting of bid and performance bonds. In 1975, petitioner became interested in participating in the construction of Middle East port facilities. The requirement of posting bid and performance bonds is customary in contracts for Middle East construction. Thus, petitioner needed sufficient assets to post such bonds. The issuers of those bonds require sufficient assets to fully insure the bonds; therefore petitioner had to maintain assets equal to the amount required for performance bonds on all Middle East contracts upon which it contemplated bidding. In 1975, petitioner joined a consortium which unsuccessfully bid on an Iranian port project. If the bid had been successful, petitioner's share of the performance bond would have been $ 1,776,000. We find petitioner's statement sufficient to place upon respondent the burden of proof with respect to this ground for 1975 but not for 1974. Petitioner specifically notes its interest and participation in Middle East facilities in 1975. However, for 1974, no factual basis is alleged. As a fourth *690 ground, petitioner states that $ 400,000 could reasonably be accumulated in 1975 for a joint venture with Pittsburgh & Conneaut Dock Company. Petitioner's statement on this ground is quoted in full as follows: In April 1975, SAII entered into an agreement with Pittsburgh & Conneaut Dock Company, a subsidiary of United States Steel Corporation, to develop and market a computerized system for maintaining bulk handling facilities. When the agreement was signed, SAII understood that for the joint venture to be successful, SAII would have to contribute between $ 400,000 and $ 500,000. We find in that statement the specificity required to place the burden of proof upon respondent. As a fifth ground, petitioner states that it was reasonable to accumulate approximately $ 500,000 per year in 1974 and 1975 to provide for a continent tort liability. During 1964 and 1965, petitioner designed the expansion of a port facility in Ohio. In 1974, an individual was seriously injured in an accident at that facility. In 1975, the injured individual filed a personal injury action against "several corporations." In October 1976, Soros, Inc., "an affiliate" of petitioner, was impleaded as *691 a defendant in that action. The plaintiff claimed compensatory damages of $ 500,000 and punitive damages of $ 1,000,000 against Soros, Inc. Petitioner's statement provides as follows: There is a risk that a judgment against Soros Inc. will result in liability to SAII [petitioner]. SAII's professional liability coverage is for $ 1,000,000 aggregate for all claims per year with $ 100,000 deductible per claim. From that, petitioner concludes that it had a contingent liability and inadequate insurance. Although petitioner's liability appears quite tenuous, respondent, nevertheless, has sufficient facts before him, by virtue of petitioner's statement, to adequately appraise him of petitioner's fifth ground. Thus, the burden must shift. As a sixth ground, petitioner states that it was reasonable for petitioner to accumulate $ 100,000 per year in 1974 and 1975 for the needs of two of its subsidiaries. Petitioner's statement provides: Throughout 1974 and 1975 SAII reasonably anticipated that a wholly-owned subsidiary, Apartamentos Velasquez, S.A., would require an additional $ 85,000 in order to complete the condominiums it was constructing in Ibiza, Spain. Furthermore, in *692 1974 and 1975 SAII reasonably anticipated Soros do Brazil would owe an additional $ 15,000 in Brazilian taxes. Each of these subsidiaries was actively engaged in business. Thus, petitioner identifies the subsidiary, why the subsidiary needs money, and the anticipated amounts needed. That is sufficient.Accordingly, respondent must bear the burden with respect to this ground. To reflect the foregoing, An appropriate order will be entered.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended. ↩
2. At a hearing on the instant motion held on May 20, 1981, the Court requested the parties to address in memoranda whether respondent or petitioner should bear the burden of proof on the question of whether or not petitioner was a "mere holding or investment company" during the years in issue. See secs. 533(b) and 535(c) (3). In his statutory notice of deficiency, respondent determined deficiencies arising with respect to sec. 531 without mention of any "mere holding or investment company" determination, and stated that no sec. 535(c) credit was allowed because no accumulations were for the reasonable needs of the business.In his answer filed herein, respondent specifically alleged that petitioner was a "mere holding or investment company." Petitioner contends the notice of deficiency was insufficient to advise it that any "mere holding or investment company" issue existed in this case, and respondent's given reason for allowing no sec. 535(c) credit implies no "mere holding or investment company" issue because accumulations for the reasonable needs of the business are irrelevant under sec. 535(c) if a corporation is a "mere holding or investment company." See n. 4, infra. Thus, petitioner concludes that respondent's allegation in his answer is a "new matter" upon which respondent should bear the burden of proof under Rule 142(a), Tax Court Rules of Practice and Procedure.
In H.C. Cockrell Warehouse Corp. v. Commssioner,71 T.C. 1036 (1979), we were presented with a notice of deficiency similar to the one issued herein followed by a specific allegation of "mere holding or investment company" status at a later time. We held that such facts did not form any basis for placing the burden of proof on respondent with respect to the "mere holding or investment company" issue. We find no meaningful distinction between this case and Cockrell.↩ Thus, petitioner must bear the burden of proving that it was not a "mere holding or investment company" during the years in issue.
3. All Rule references are to the Tax Court rules of Practice and Procedure.↩
4. The effect of the placement of the burden of proof as to accumulation for reasonable needs of a business will vary from case to case. The operative fact for imposition of the accumulated earnings tax is that the taxpayer corporation was formed or availed of for the purpose of avoiding the payment of income tax by shareholders by accumulation, rather than distribution, of earnings and profits. Sec. 532(a). If earnings and profits are allowed to accumulate beyond the reasonable needs of the business, such purpose is considered to be established unless the taxpayer-corporation proves the contrary by "the preponderance of the evidence." Sec. 533(a). Thus, the determination of whether any "improper" accumulation occurred can be very important to the determination of the operative "purpose" element. Perhaps more important in a practical sense is the fact that, in most cases arising under sec. 531, the taxpayer corporation is entitled to a credit against the accumulated earnings tax equal to the earnings and profits accumulated for the reasonable needs of the business (subject to some diminution with respect to net capital gains.) Sec. 535(c) (1). Thus, if all earnings and profits are accumulated for the reasonable needs of the business, the "purpose" element becomes largely irrelevant. See John P. Scripps Newspapers v. Commissioner,44 T.C. 453 (1965). However, such a back burner placement cannot be given to the "purpose" element if the taxpayer corporation is a "mere holding or investment company." See n. 2, supra. In that situation, any credit against the accumulated earnings taxes is calculated without reference to accumulations for the reasonable needs of the business. Sec. 535(c) (1) and (3). Thus, accumulations for the reasonable needs of the business would be relevant only in determining the existence of the improper "purpose." See sec. 533(b)↩.
5. Respondent does not challenge the truth of the factual allegations made in petitioner's sec. 534(c) statement. See Chatham Corp. v. Commissioner,48 T.C. 145 (1976). Solely for purposes of ruling on the motion before us, we shall accept as true the statements of fact set forth in petitioner's sec. 534(c) statement. Thus, infra,↩ we shall state those factual allegations as if they were true; however, such is not to be taken as our finding those factual allegations as actually true for any purpose.
6. It is clear that a sec. 534(c) statement may be sufficient as to one ground and insufficient as to another. Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566↩ (1965). 7. We note that, on September 17, 1979, petitioner answered questions posed and produced documents requested by respondent on May 4, 1979. On March 2, 1981, petitioner provided additional information and documents requested by respondent.↩
8. Of course of the grounds presented in a sec. 534(c) statement together with the facts alleged in support thereof, if true, clearly demonstrate reasonable accumulations, our job becomes easier. See Bremerton Sun Publishing Co. v. Commissioner,supra;John P. Scripps Newspapers v. Commissioner,supra. However, accumulations by a corporation for another entity do not always present an easily decided question. See Case, Accumulated Earnings Tax Aspects of Business Expansions and Investments, 32 Tax L. Rev. 3 (1976). See also sec. 1.537-3(b), Income Tax Regs. Such questions are better resolved at trial than on the basis of a sec. 534(c) statement. Atlantic Commerce & Shipping Co.,Inc. v. Commissioner,T.C. Memo. 1973-106, affd. 500 F.2d 937↩ (2d Cir. 1974).
9. Roleo Corporation, a Delaware corporation wholly owned by Andrew Romay, was also a general partner.↩
10. Petitioner's statement delineates the various tasks it performed and estimates the time its officers and employees dedicated to Cleancoal.↩
11. Cleancoal appealed that ruling, and the matter is still pending.↩
12. As to the $ 500,000 per year approximated for other "total project responsibility" projects, a different result obtains herein. While petitioner states that, in 1976, it "was contemplating constructing another coal terminal on the Ohio river [sic];" in 1977, it "expended considerable effort in a successful attempt to obtain the rights of develop a forty million dollar coal terminal in San Francisco Bay;" and, in 1976 it "bid on a new $ 40,000,000 port project in Galveston, Txas, offering to participate in the ownership and management of the project as well as to perform the engineering work," no specifics concerning either 1974 or 1975 are given. Rather, only a general intent is alleged for those years. Thus, the burden as to those $ 500,000 amounts must remain with petitioner.↩